## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**LORENZO M. PLEDGER,**

      **Plaintiff,**

**v.**                                            **Civil Action No. 2:16cv83**
                                                                     **(Judge Bailey)**

**LORETTA LYNCH; CHARLES**
**SAMUELS, JR.; J. F.CARAWAY; UNITED**
**STATES OF AMERICA; MR. WEAVER;**
**MRS. GROVE; E. ANDERSON; JOSHUA**
**HALL, Nurse; ALICIA WILSON;**
**ANDREA HALL; and ST. JOSEPH'S**
**HOSPITAL,**

      **Defendants.**

## REPORT AND RECOMMENDATION

### I. Procedural Background

On September 27, 2016 in the Eastern District of North Carolina, Plaintiff, an inmate incarcerated FCI Butner Medium II, in Butner, North Carolina, initiated this action against the above-named defendants by filing a combined Federal Tort Claim Act ("FTCA") complaint and Bivens civil rights action complaint. ECF No. 1. The case was transferred to this district on October 6, 2016, where it was docketed as a FTCA action. ECF No. 4. On October 7, 2016, the Clerk of Court issued a Notice of Deficient Pleading, providing Plaintiff with court-approved forms for the filing of a FTCA complaint. ECF No. 7. On October 31, 2016, Plaintiff filed his FTCA complaint on a court-approved FTCA form. That same day, he also filed a Request [for an] Extension to File Claim and Request for Information, seeking to add Bivens claims. By Order entered November 1, 2016, Plaintiff's Request [for an] Extension to File Claim and Request for Information was granted and he was given an extension of time to complete a court-

approved form <u>Bivens</u> complaint; a copy of the same was provided to him by the Clerk. ECF No. 15. On November 18, 2016, Plaintiff filed his court-approved form <u>Bivens</u> complaint. ECF No. 17.

Thereafter, an Order was entered, notifying Plaintiff of the potential consequences of pursuing both a FTCA action and a <u>Bivens</u> action. ECF No. 23.  By Notification filed on June 23, 2017, Plaintiff elected to proceed on both actions. ECF No. 26.  Subsequently, Plaintiff was directed by Order entered November 28, 2017 to proceed solely on the FTCA action.  ECF No. 28. By Order entered the following day, the United States of America was directed to answer the FTCA complaint. ECF No. 29. On December 13, 2017, the Defendant United States of America filed a Motion to Dismiss with a memorandum in support. ECF Nos. 36, 37. Because Plaintiff is appearing *pro se*, on December 18, 2017, a <u>Roseboro</u> Notice was issued.  ECF No. 39.  On December 27, 2017, Plaintiff moved for a 60-day extension of time in which to obtain a screening certificate of merit.  ECF No. 43.  By Order entered January 5, 2018, the extension was granted.  ECF No. 44.

For reasons appearing to the Court, by Order entered January 5, 2018, the November 28, 2017 Order directing Plaintiff to proceed solely on the FTCA action was vacated.  ECF No. 45. Accordingly, on January 5, 2018, an Order to Answer was entered, directing the <u>Bivens</u> defendants, including St. Joseph Hospital ("SJH"), to answer the <u>Bivens</u> complaint.  On January 26, 2018, SJH filed a motion to dismiss and memorandum in support. ECF No. 53. Because Plaintiff was proceeding *pro se*, on January 29, 2018, a <u>Roseboro</u> Notice was issued. ECF No. 54.

By separate motions filed on February 23, 2018, Plaintiff moved for an extension of time to respond to SJH's dispositive motion and for appointed counsel. ECF Nos. 57, 58.  By Order entered February 27, 2018, Plaintiff's motion for an extension of time was granted. ECF No. 59.

On February 27, 2018, by special appearance of counsel and without waiving defenses, including service of process, Defendants Loretta Lynch, Charles Samuels, Eddie Anderson, John Caraway, Ruthie Carson, Andrea Shahan (formerly Hall), Joshua Hall, Todd Savidge, Andrea Tanner (formerly Smith-Posey), Michael Weaver, Charles Williams, Alicia Wilson, Rebecca Grove, Johanna Lehmann, and S. Hudnall (the "Individual Federal Defendants"), moved for an extension of time and consolidated response date. ECF No. 60. By paperless Order entered February 28, 2018, the Individual Federal Defendants' motion was granted. ECF No. 61. By separate Order entered the same day, Plaintiff's second motion for appointed counsel was denied. ECF No. 62.  On March 9, 2018, Plaintiff filed a motion for reconsideration of the Order granting him the extension of time in which to respond to SJH's dispositive motion. ECF No. 65. By Order entered March 13, 2018, Plaintiff was directed to provide full names and/or updated addresses for the then-as-yet unserved <u>Bivens</u> defendants within twenty-one days.  ECF No. 66.

On March 22, 2018, Plaintiff filed a response in opposition to the United States' motion to dismiss his FTCA complaint. ECF No. 80.   On April 6, 2018, Plaintiff filed a motion requesting that the Clerk of Court provide the addresses of the remaining defendants; within it, he provided a list of addresses for some of the as-yet unserved defendants.  ECF Nos. 82, 83.  By Order entered April 9, 2018, Plaintiff's motion to have the Clerk provide addresses for the remaining defendants was denied; he was given another fourteen days in which to provide the requested information; and the Clerk was directed to correct certain defendants' names on the docket.  ECF No. 84.  By separate Order, the Clerk was directed to issue summonses for

defendants Lehmann and Savidge at the new addresses provided by Plaintiff. ECF No. 85. On April 16, 2018, Plaintiff filed a motion for the Clerk to contact FCI Gilmer for the addresses of the remaining un-served defendants.  ECF No. 87. On April 30, 2018, Plaintiff moved for judicial notice. ECF No. 93. On May 2, 2018, the Individual Federal Defendants filed for a second extension of time and consolidated response date. ECF No. 95.  By Order entered May 4, 2018, Plaintiff's motion for the Clerk to contact FCI Gilmer for the addresses of the un-served defendants was construed as a motion for reconsideration of the Court's April 9, 2018 Order and denied. ECF No. 96. By separate Order entered the same day, the Individual Federal Defendants' second motion for an extension of time and consolidated response date was granted. ECF No. 97. By Order entered May 9, 2018, certain defendants were dismissed.  ECF No. 98.  On May 10, 2018, the Individual Federal Defendants moved for leave to file excess pages [ECF No. 99]; by Order entered May 14, 2018, the motion was granted. ECF No. 101.

On May 17, 2018, the remaining Individual Federal Defendants filed a Motion to Dismiss or in the Alternative, Motion for Summary Judgement with a memorandum in support. ECF Nos. 103, 104.

On May 18, 2018, Plaintiff filed a motion for reconsideration of the Order dismissing certain defendants.  ECF No. 105. By Order entered May 21, 2018, the motion for reconsideration was denied. ECF No. 107.

Because Plaintiff was proceeding *pro se*, on May 29, 2018, a Roseboro Notice was issued, advising Plaintiff of his right to respond to the remaining Individual Federal Defendants' dispositive motion. ECF No. 108.

On June 8, 2018, Plaintiff's motion for reconsideration [ECF No. 65] was construed as a motion for an extension of time and consolidated response date and granted in part.  ECF No.

116.  On June 8, 2018, Plaintiff filed two motions for default judgment against Defendant SJH. ECF No. 117, 118.

On June 14, 2018, Plaintiff filed a motion for an extension of time in which to respond to the Individual Federal Defendants' dispositive motion, averring that he had not yet received it and only learned it was filed when the Roseboro Notice was issued. ECF No. 121. On June 15, 2018, the Individual Federal Defendants filed a copy of the certificate of service for their dispositive motion, averring that a copy of their dispositive motion was sent to Plaintiff on June 15, 2018.  ECF No. 122. By Order entered the same day, the Individual Federal Defendants were directed to resend a copy of their dispositive motion to the Plaintiff via certified mail, return receipt requested, and to file a copy of the return receipt with the Court, and Plaintiff's motion for an extension of time was granted in part. ECF No. 123. On June 21, 2018, the Individual Federal Defendants filed a copy of the certified mail return receipt, proving that they had resent a copy of their dispositive motion to the Plaintiff and it had been received on June 18, 2018.  ECF No. 125.

On June 26, 2018, Plaintiff again moved for appointed counsel. ECF No. 126. Plaintiff also moved for reconsideration of this Court's earlier Order denying a motion for reconsideration. ECF No. 132.

On June 27, 2018, Plaintiff moved for an extension of time to respond to the Individual Federal Defendants' dispositive motion. ECF No. 127.  By Order entered the same day, SJH was again directed to answer the Bivens complaint[1] and given twenty-one days to do so; the time for Plaintiff to respond was reset. ECF No. 128. By Order entered June 28, 2018, Plaintiff's third motion for appointed counsel was denied. ECF No. 129.  By separate Orders entered the same

---

[1] By error of the Clerk, the copy of the complaint sent to SJH with the January 5, 2018, summons and Order to Answer the Bivens complaint was apparently a copy of the FTCA complaint, not the Bivens complaint.

day, Plaintiff's motion for a further extension of time in which to respond to the Individual

Federal Defendants' dispositive motion and his motions for default judgment against SJH were

denied. ECF No. 130, 131. By Order entered July 2, 2018, Plaintiff's motion for reconsideration

was denied as moot. ECF No. 133.

On July 12, 2018, Plaintiff filed his response in opposition to the Individual Defendants'

dispositive motion. ECF No. 137.  On July 17, 2018, Defendant SJH filed its second Motion to

Dismiss.  ECF No. 141.  Another Roseboro Notice issued on July 24, 2018, advising Plaintiff of

his right to respond to Defendant SJH's second Motion to Dismiss, setting the date for Plaintiff's

response to the date originally specified in the second Order directing St. Joseph Hospital to

answer the Bivens complaint.  ECF No. 143.  On July 30, 2018, Plaintiff moved for an extension

of time to respond to Defendant SJH's second Motion to Dismiss. ECF No. 146.  By Order

entered August 1, 2018, Plaintiff's motion was granted in part. ECF No. 148.  On August 9,

2018, Plaintiff filed his response in opposition to Defendant SJH's second Motion to Dismiss.

ECF No. 150.

This case is before the undersigned for review, Report and Recommendation pursuant to

LR PL P 2.

## II. Factual History

Plaintiff was sentenced on February 19, 2014 in the Eastern District of North Carolina to

216 months imprisonment to be followed by three years supervised release, for Conspiracy to

Distribute and Possession with Intent to Distribute a Quantity of Cocaine, in violation of 21

U.S.C. §§ 841(a)(1) and 846. See United States v. Pledger, E.D.N.C. Case No. 2:12cr23, ECF

Nos. 1, 71. Plaintiff is currently designated to the FCI Butner Medium II, at Butner, North

Carolina.  The BOP's online inmate locator indicates that Plaintiff's expected release date is July 22, 2028.  See < https://www.bop.gov/inmateloc/ >

On March 27, 2014, Plaintiff departed from the Oklahoma transfer center for FCI Gilmer. ECF No. 104-2 at 193 – 196. Plaintiff arrived at and was incarcerated at FCI Gilmer from April 8, 2014 through February 2, 2016. See Declaration of Dr. Eddie Anderson ("Anderson Decl."), ECF No. 104-1, ¶ 5.

Plaintiff's medical records reveal that he was seen by Dr. Eddie Anderson ("Dr. Anderson") in Health Services on April 16, 2014 for a history and physical. Anderson Decl., ECF No. 104-1, at ¶ 6. Anderson noted that Plaintiff had been diagnosed with Crohn's disease[2] 1 – 2 years earlier [sic].[3] ECF No. 104-2 at 72. Plaintiff was not on any Crohn's maintenance medications at the time. ECF No. 104-1, at ¶ 6. He also had a history of major depressive disorder, generalized anxiety disorder, and asthma. ECF No. 104-2 at 72 – 73. He was on an albuterol inhaler and amitriptyline 100 mg at bedtime. Id. at 74. He had a history of smoking a pack a day for 30 years.[4]  ECF No. 104-2 at 92.  He was 6' tall and weighed 216.1 #. Id. His

---

[2] Crohn's disease is chronic inflammatory bowel disease ("IBD") characterized by inflammation of the digestive, or GI tract. It can affect any part of the GI tract from the mouth to the anus, but is more commonly found at the end of the small intestine (the ileum) where it joins the beginning of the large intestine (or colon). It can also affect the eyes, skin, and joints. It can begin at any time, but most commonly appears between ages 15 – 35 and is equally distributed among men and women. Crohn's causes frequent recurring diarrhea, rectal bleeding, unexplained weight loss, fever, abdominal pain and cramping, fatigue, low energy, and reduced appetite. See Understanding Crohn's Disease, *available at:*
 <https://www.crohnsandcolitis.com/crohns?cid=ppc_ppd_ggl_cd_da_crohn%27s_diseases_Phrase_64Z1867745 >

[3] Given that Plaintiff's BOP medical records variously document that his last colonoscopy was done in 2004 or 2005 [ECF No. 104-2 at 33, 168], it appears likely that his FCI Gilmer clinicians and other Health Services staff had access to at least some of Plaintiff's prior medical records, thus, it is unclear why Anderson documented that Plaintiff had been diagnosed with Crohn's "1 – 2 years earlier," which would have made the date of his Crohn's diagnosis 2012 or 2013.  Plaintiff's complaint alleges he was diagnosed with Crohn's Disease in 2004 [ECF No. 17 at 14, 17, 20] or 2005 [ECF No. 17 at 8], thus it seems more likely that those dates are more accurate. See also ECF No. 104-4 at 22 (Plaintiff reported to FCI Butner Medium's medical staff that his "only colonoscopy on [the] street [sic] was at UNC in 2004.").

[4] A March 14, 2016 Butner Federal Medical Center ("FMC") Pulmonary Function Report indicates that Plaintiff was a past smoker; that he had quit smoking six years earlier; and that he had smoked "cigarettes 0.25 packs" for 6.25 "pack years." ECF No. 104-5 at 38.

medical records also included a Modified Diet Request, indicating that per his own report, he was allergic to corn, nuts, beans, tomatoes and cheese. ECF No. 104-2 at 119.  However, the nurse documented that he had no known allergies. ECF No. 104-2 at 120. Routine labs were ordered, and hemoccult cards were ordered, to test for blood in Plaintiff's stool. ECF No. 104-1, at ¶ 6.

On April 24, 2014, Plaintiff's blood was drawn for lab work and he submitted a urinalysis. ECF No. 104-2 at 181, 186. A complete blood count ("CBC")[5] was done; his hemoglobin and hematocrit ("H&H") was nearly normal at 13.4/40.3 (normal = 13.5 – 18.0/40.0 – 52.0); but his MCV[6] was low at 73.4 (80-100). ECF No. 104-2 at 181.

On April 30, 2014, Plaintiff's three hemoccult slides tested negative. ECF No. 104-2 at 179.

On June 18, 2014, Plaintiff was seen at sick call by PA C. Gherke, for a complaint of Crohn's disease symptoms for the previous two days, including gastrointestinal ("GI") pain and

---

[5] A complete blood count measures various components of blood, including red blood cells ("RBC") or erythrocyte count (count of cells which carry oxygen); white blood cells ("WBC") or leukocyte count (cells that help fight infection); hemoglobin (Hgb) (oxygen-carrying protein which is seen in the red blood cells); hematocrit (HCT) (ratio of the volume of RBCs to the total blood volume) (hemoglobin and hematocrit are markers for evaluating anemia); platelets or thrombocyte count; and red blood cell indices. The red blood cell indices include mean corpuscular volume (MCV); mean corpuscular hemoglobin (MCH); and mean corpuscular hemoglobin concentration (MCHC). See Complete Blood Count (CBC): All You Need to Know, *available at*: <https://www.medinfi.com/blog/complete-blood-count-cbc/?gclid=EAIaIQobChMI7pjy-rjA3AIVjdlkCh1u-Q5TEAAYASAAEgIhTfD_BwE >
    The MCV defines the size of the red blood cells; MCH quantifies the amount of hemoglobin per red blood cell; and MCHC indicates the average concentration of hemoglobin in a given volume of blood; it is a calculated value derived from the measurement of hemoglobin and the hematocrit. The red cell distribution width (RDW) represents a measurement of the range in the volume and size of red blood cells; it is expressed as a percentage. See Red Cell Indices, *available at*: < https://www.ncbi.nlm.nih.gov/books/NBK260/ >

[6] Low MCV, MCH, and MCHC, in the presence of a normal or nearly normal H&H is an early indicator of a blood loss anemia. See Anemia, Microcytic Hypochromic, *available at*:
< https://www.ncbi.nlm.nih.gov/books/NBK470252/ >

pain "all over" at a level of 10 out of 10.[7] ECF No. 104-2 at 168.  Gherke noted that Plaintiff's "last scope" was done in 2005 and made an appointment for him to see a provider. Id.

On June 19, 2014 at 11:42 am, Plaintiff was seen by PA Johanna Lehmann ("Lehmann") for a Crohn's flare up. ECF No. 104-2 at 52 – 56. He was alert and oriented but appeared to be in pain; had active bowel sounds; a soft abdomen with right and left lower quadrant ("RLQ" and "LLQ") tenderness and suprapubic tenderness but no guarding or masses. Id. at 52 – 53. He was prescribed Prednisone[8] for 12 days, given an injection of Methylprednisolone[9] [id. at 53], and a Ketorolac[10] injection for pain. Id. He was prescribed Mesalamine[11] delayed release 400 mg tablets, to be taken three times a day for 180 days. Id. at 54. Labs were ordered, as was a general surgery consultation for a colonoscopy. Id. at 53 – 54. He was instructed to follow up at sick call as needed. Id. at 54.

---

[7] Inmates may report to the Health Services Department during sick call. This allows them an opportunity to address any medical complaints with Health Services staff. The Bureau of Prisons ("BOP") uses a triage process during sick call. When inmates present to sick call, medical staff evaluate and classify them based on the priority of need for treatment. The triage process allows truly urgent conditions to be addressed the same day, while also allowing more routine conditions to be addressed at scheduled appointments. During triage, inmate/patients provide a brief history and vital signs are taken. Appointments are scheduled with appropriate providers within a time frame appropriate for the inmate/patient's condition and medical needs. See Anderson Decl., ECF No. 104-1, ¶ 3 at 1.

[8] Prednisone is an oral synthetic corticosteroid (steroid) used for suppressing the immune system and inflammation. See Prednisone, available at: < https://www.medicinenet.com/prednisone/article.htm >

[9] Methylprednisolone (brand name "Medrol") is a glucocorticoid (steroid) which decreases inflammation and changing the body's immune response. It is used to treat many serious conditions where suppression of symptoms is indicated, including stomach or intestinal problems such as ulcerative colitis or Crohn's disease. See Methylprednisolone,                Oral                Tablet,                available                at: <https://www.healthline.com/health/methylprednisolone-oral-tablet >

[10] Ketorolac, or Toradol, a nonsteroidal anti-inflammatory drug (NSAID), is indicated for the short-term (up to 5 days in adults), management of moderately severe acute pain that requires analgesia at the opioid level and only as continuation treatment following IV or IM dosing of ketorolac, if necessary.  See Toradol, available at < https://www.rxlist.com/toradol-drug.htm >

[11] Mesalamine is an anti-inflammatory agent used to treat ulcerative colitis and mild to moderate Crohn's disease. Its exact mechanism of action is unknown, but it is believed to reduce inflammation in the colon. See What is mesalamine, and how does it work (mechanism of action)? available at: <https://www.medicinenet.com/mesalamine/article.htm#what_is_mesalamine_and_how_does_it_work_mechanism _of_action >

On July 1, 2014, Plaintiff had a combined sick call and Chronic Care Clinic ("CCC") appointment with PA Lehmann.[12] ECF No. 104-2 at 44 – 49. He reported "doing OK" but was "aggravated" about trying to be seen, because he had come to the CCC several times, waited, did not get in and had to keep returning. Id. at 44. His chief complaint ("CC") was mental health; he had been on Elavil when he arrived at FCI Gilmer but stopped coming to pill line to get it because he did not like it because it did not work, and wanted to get back on Sinequan;[13] and he was seeing psychology for depression and anxiety. Id. He reported that his GI symptoms were a little better since starting back on medication for his Crohn's.[14] Id. He complained of abdominal pain/colic, bloating and constipation but denied bloody stool, nausea and/or vomiting. Id. On exam, he had active bowel sounds and his abdomen was soft with no guarding or tenderness. Id. at 44, 46. A new prescription for Sinequan (doxepin) was ordered; his albuterol inhaler and Mesalamine prescriptions were renewed, and labs were ordered.  Id. at 47. He was instructed to follow up as needed. Id. at 47 – 48.

On July 22, 2014, Plaintiff's labs were drawn. ECF No. 104-2 at 165. That same day, he was provided three hemoccult cards. ECF No. 104-2 at 158. Ultimately, the results for all three of the cards were negative. Id.; see also ECF No. 104-2 at 43. His H&H was still nearly normal at 13.2/39.4 (normal = 13.5 – 18.0/40.0 – 52.0); but his MCV was low at 73.1 (80 – 100); as was

---

[12] The CCC is a method used by the BOP to manage the health care of inmates with chronic health conditions. Inmates enrolled in the program are seen by staff physicians on a regular basis for monitoring of their health conditions. The time frame is between one month and twelve months, based on the complexity of their health conditions. See Anderson Decl., ECF No. 104-1, ¶ 4 at 1.

[13] Sinequan (generic name: Doxepin) is a tricyclic antidepressant used to treat symptoms of depression and/or anxiety. See Sinequan, *available at* < https://www.rxlist.com/sinequan-drug/patient-images-side-effects.htm >

[14] It is unclear from the available medical records whether Plaintiff had ever been on medication for his Crohn's previously.

his MCH, at 24.5 (25.4 -34.6); his RDW was slightly elevated at 16.6 (11 – 15); and his platelets were slightly elevated at 497 (150 – 400). ECF No. 104-2 at 165.

On August 4, 2014, Plaintiff had additional blood work. ECF No. 104-2 at 160. His H&H") had dropped slightly, and was now 12.7/38.9 (normal = 13.5 – 18.0/40.0 – 52.0); his iron was slightly low at 64 (normal = 65 - 175); but his ferritin, transferrin, TIBC[15] and % saturation were all within normal limits ("WNL").  ECF No. 104-2 at 160. A urinalysis done the same day was negative. Id. at 163.

On September 11, 2014 at 8:37 am, Plaintiff was seen in CCC by PA Lehmann. ECF No. 104-2 at 33 – 39. She noted that Plaintiff's last colonoscopy was in 2004; a repeat colonoscopy had been approved; and staff was waiting for an appointment for it to be scheduled. ECF No. 104-2 at 33. His CC was breathing problems; he was recovering from a cold. Id. He was noted to have Crohn's disease and asthma/allergies. He reported having been off of mental health prescriptions "for a while" and working with psychology "to verify his stability." Id. He weighed 212 #. Id. at 34. On exam, he had active bowel sounds; his abdomen was soft; he had LUQ and left lower quadrant ("LLQ") tenderness; but no guarding or rebound tenderness. Id. at 35. His albuterol and Mometasone Furoate inhaler prescriptions were renewed; as were his Doxepin 50 mg and Mesalamine prescriptions; and labs were ordered. ECF No. 104-2 at 36 – 37.

On September 29, 2014, Plaintiff had blood work drawn. ECF No. 104-2 at 152. His H&H was normal at 13.5/40.0 (normal = 13.5 – 18.0/40.0 – 52.0).  ECF No. 104-2 at 152.

On October 2, 2014, Plaintiff's stool tested negative for H. pylori. ECF No. 104-2 at 150.

---

[15] "TIBC" is an acronym for total iron binding capacity, a test that gauges if there is too much or too little iron in the bloodstream. Iron, a mineral found in all of the body's cells, is obtained through diet. Once it enters the body, it is carried throughout the bloodstream by a protein called transferrin, which is produced in the liver. The TIBC test evaluates how well transferrin carries iron through the blood. Iron helps form hemoglobin, an important protein in red blood cells that is essential to carry oxygen throughout the body. Iron is an essential mineral because hemoglobin cannot be made without it. See Total Iron Binding Capacity Test, *available at*: https://www.healthline.com/health/total-iron-binding-capacity >

On October 17, 2014, Plaintiff was seen at Health Services by PA Lehmann for a sick call visit, complaining of oral aphthous ulcers (canker sores);[16] LLQ abdominal tenderness; and anxiety, for which he wanted medication. ECF No. 104-2 at 26 – 29. *Inter alia*, he was prescribed Mesalamine ER capsules 0.375 gm, five tablets to be taken by mouth daily for 180 days and Prednisone 20 mg three tablets daily for twelve days, both for his Crohn's. Id. at 27. He was counseled on his plan of care, compliance, and access to care. Id. at 28.

On November 13, 2014, Plaintiff was seen by Todd Savidge MD ("Dr. Savidge") at sick call triage at Health Services, reporting bloody stools for the past week; moderate abdominal cramping, similar to prior Crohn's flare ups; but no fever. ECF No. 104-2 at 147. He was assessed, prescribed a Prednisone dose pack, and instructed to return if the pain increased or if he had no improvement in a week. ECF No. 104-2 at 147; see also ECF No. 104-2 at 23.

On November 14, 2014 at 7:36 am, Dr. Savidge made an Administrative Note regarding Plaintiff's new order for the Prednisone 50 mg dosepak, to be taken by mouth, and tapered as directed, daily for six days, for his Crohn's. ECF No. 104-2 at 22.

On November 18, 2014 at 11:47 am, Plaintiff was seen in Health Services by PA Alicia Wilson for increased rectal bleeding while at work. ECF No. 104-2 at 14. It was noted that he "started a taper on the 14th but the bleeding has not decreased." Id. Ferrous Gluconate (iron) tablets were prescribed, to be taken two times a day for 180 days. Id. His diagnosis was anemia and Crohn's. Id.

On December 10, 2014, Plaintiff was seen by Dr. Savidge at sick call at Health Services, for stomach pain that had started during the night. ECF No. 104-2 at 144. His vital signs were

---

[16] Aphthous ulcers, or canker sores, are related to Crohn's disease; while they are observed in only approximately 9% of cases, oral inflammation precedes intestinal symptoms of Crohn's in about 60% of these patients. The oral ulcerations can be an early sign of ulcerations in the mucosa throughout the entire GI tract. See Crohn's Disease Masquerading as Aphthous Ulcers, *available at:* < https://www.ncbi.nlm.nih.gov/pubmed/9649656 >

stable; he reported that his pain was in the RLQ, the usual flare-up location for his Crohn's; he denied vomiting, diarrhea, or rectal bleeding, and reported that his symptoms had improved since that morning. Id. On exam, he had moderate localized tenderness but no mass or peritoneal signs.[17] Id. He was diagnosed with an early flare up and prescribed a steroid burst, and instructed to return if it persisted or if he had recurrent pain after he finished it, requiring a longer course of steroids. Id. He signed a medical treatment refusal form, refusing a colonoscopy and was warned that the risks of refusal were worsened condition, missed diagnosis or death. ECF No. 104-2 at 145.

On December 11, 2014, at 12:27 pm, an administrative note was entered by PA Lehmann, indicating that Plaintiff had had 3 sick call visits for Crohn's flare ups since his colonoscopy request was written, but had refused the medical trip for his colonoscopy the day before. ECF No. 104-2 at 12. Plaintiff was seen in Health Services by Dr. Savidge at 2:40 pm that day for abdominal pain from Crohn's disease; he was prescribed Prednisone, to be taken three times a day for three days, and advised to follow up as needed. ECF No. 104-2 at 9 – 11.

On March 9, 2015 at 2:00 pm, Plaintiff was seen by Dr. Savidge at sick call in Health Services for Crohn's flare up abdominal pain. ECF No. 104-3 at 103 - 104. He reported recurrent right-sided abdominal pain with scant blood in his stool; he had a moderately tender abdomen, with pain poorly localized on the right side, and no peritoneal signs. Id. at 243. He was examined, prescribed Prednisone tablets, 60 mg orally, to be taken three times a day for three

---

[17] Peritoneal signs are rebound tenderness, tenderness to percussion, and involuntary guarding when the abdomen is palpated, caused by various pathological processes such as bowel obstruction, bowel rupture, ruptured appendix, ovarian or gallbladder problems. Unless timely diagnosed and treated, these "surgical abdomen" problems can lead to peritonitis and sepsis; these issues require emergent surgical intervention to avoid shock or a worsening exam. See Acute Abdomen, *available at*:
< https://www.mc.vanderbilt.edu/documents/GSR/files/SGR_RTC_OttOct12Acute%20Abdomen.pdf >

days, instructed to return to sick call or CCC as needed, and to return immediately if his condition worsened. Id. at 103.

On March 10, 2015 at 8:40 am, Plaintiff was seen in the CCC by Dr. Anderson. ECF No. 104-3 at 97 - 102. *Inter alia*, Dr. Anderson noted that Plaintiff originally refused the colonoscopy "mostly because it sounds like they were putting him in [the] SHU[18] pre-procedure," but after discussion, he reluctantly agreed to have it done. Id. Plaintiff's current exacerbation of Crohn's had started three days earlier with abdominal pain and diarrhea; his rate of recurrence was noted to be about every 2 months; he agreed to try Entocort[19] in an attempt to stop the repeated flare ups and put his Crohn's in remission. Id. On exam, his vital signs were stable; his weight was 197 pounds. Id. at 97 – 98. His abdomen was WNL, soft, with tenderness on palpation and no guarding or rigidity. Id. at 98. *Inter alia*, a new prescription for Omeprazole[20] capsules was written and a request for approval of the Entocort, a non-formulary drug, was made. Id. at 99 - 100. His other prescriptions were reviewed and/or renewed or discontinued. Id. at 100 – 101. Consults for colonoscopy (for provisional diagnoses of Crohn's and anemia) and esophagogastroduodenoscopy ("EGD") (for provisional diagnoses for GERD,[21] Crohn's, and anemia) were made. Id.

---

[18] The "SHU," or Special Housing Unit, is a housing unit in a BOP institution where inmates are securely separated from the general inmate population, and may be housed either alone or with other inmates. Special housing units help ensure the safety, security, and orderly operation of correctional facilities, and protect the public, by providing alternative housing assignments for inmates removed from the general population. See BOP Program Statement 5270.11.

[19] Entocort (Budesonide EC) is a synthetic corticosteroid used for treatment of mild to moderate active Crohn's disease. See Entocort, *available at:* < https://www.rxlist.com/entocort-drug.htm >

[20] Omeprazole (brand name Prilosec) is a proton pump inhibitor that decreases the amount of acid produced in the stomach. It is used to treat symptoms of gastroesophageal reflux disease ("GERD") and other conditions caused by excess stomach acid or to promote healing of erosive esophagitis (damage to the esophagus caused by stomach acid). See Prilosec, *available at:* < https://www.drugs.com/prilosec.html >

[21] GERD is an acronym for gastroesophageal reflux disease.

On March 16, 2015 at 12:08 pm, Dr. Anderson entered an Administrative Note indicating that the non-formulary drug Entocort was approved. ECF No. 104-3 at 96.

On March 18, 2015, Plaintiff had blood work drawn. ECF No. 104-3 at 239 – 40.  His pertinent lab results were iron 39 (65- 175); % saturation low at 14.3 (20 – 50); H&H 12.3/37.8 (13.5-18.0/40-52); MCV low at 72.8 (80-100); MCH low at 23.7 (25.4 – 34.6); and his RDW was slightly elevated at 16.8 (11.0 – 15). ECF No. 104-3 at 239 – 40.

On March 24, 2015 at 2:39 pm, Dr. Anderson entered an Administrative Note stating "hgb, Fe, MCV all LOW," and noted that Plaintiff was pending a colonoscopy and "may be candidate for IV iron."  ECF No. 104-3 at 95. Later that same day, at 3:12 pm, Plaintiff was seen at sick call in Health Services by Dr. Savidge for a complaint of abdominal pain. ECF No. 104-3 at 93 – 94, 236. He reported that the right side of his stomach was "hurting so bad and I'm trying to do a follow up on my Crohn's." Id. at 236. His vital signs were stable. Id. On exam, he was noted to have intermittent, sometimes severe, right-mid-abdomen pain that seemed worse despite his new prescription of Entocort; his pain was poorly-localized, with right-sided tenderness and no peritoneal signs. Id. at 236. He was examined and Prednisone tablets were prescribed in a tapering dose for six days. Id. at 93. An x-ray of his abdomen was ordered. Id. A review of his labs was conducted. He was instructed to follow up at sick call or at CCC as needed, and to return immediately if his condition worsened. Id. at 94.  The x-ray of his abdomen, done the same day, was negative. Id. at 237.

On April 7, 2015 at 3:35 pm, Plaintiff was seen in sick call at Health Services by Dr. Savidge for Crohn's flare up abdominal pain he was instructed to follow up at sick call as needed and counseled on a plan of care.  ECF No. 104-3 at 92, 235. Plaintiff reported that the only thing that made the pain better was not eating, and that eating made it worse. Id. at 235. He reported

that he was "not on recommended diet – right foods not available." Id. A low residue diet was ordered and his medications were continued, and he was instructed to continue his medications pending the colonoscopy. Id. Dr. Savidge wrote a modified diet request for a low residue diet for Plaintiff's Crohn's disease. ECF No. 104-3 at 131.

On May 14, 2015 at 11:56 am, an Administrative Note was entered by PA Alicia Wilson regarding a colonoscopy prep for Plaintiff's impending colonoscopy. ECF No. 104-3 at 91.

The May 19, 2015 SJH Operative Report of the EGD and colonoscopy revealed a postoperative diagnosis of history of Crohn's disease; gastric and duodenal ulcers and, other than some swelling in the sigmoid,[22] his colon was otherwise normal.[23] ECF No. 104-3 at 218 - 19. Regarding the finding of the gastric and duodenal ulcers, the surgeon (Salvatore Lanasa, MD) noted that they might possibly be "aspirin-related ulcer since he takes mesalamine oral five times a day." Id. Lansasa's operative report stated, **"[t]he plan will be to stop the mesalamine for four weeks.** The patient is already taking omeprazole 20 milligrams daily. We are going to increase that to 40 milligrams daily and recheck the patient as needed.  Await also the results of the biopsy."  ECF No. 104-3 at 219 (emphasis added).

The surgical pathology report of the May 19, 2015 procedures reveals that the stomach biopsy showed mild chronic gastritis[24] without intestinal metaplasia[25] and was negative for

---

[22] The sigmoid colon is the terminal section of the large intestine that joins the descending colon to the rectum; it derives its name from the fact that it is curved in the form of an S (Greek *sigma*: σ). See Sigmoid Colon – Anatomy, available at: < https://www.britannica.com/science/sigmoid-colon >

Because of the swelling found in the sigmoid, Lanasa took random biopsies of the area, because swelling inside the bowel is one symptom of Crohn's disease.

[23] During the colonoscopy, the colonoscope was only inserted up to the ileocecal valve which separates the ileum from the colon; it did not enter or examine the ileum. See ECF No. 104-3 at 218.

[24] Gastritis is an inflammation, irritation, or erosion of the stomach lining. It can occur suddenly (acute) or gradually (chronic). It can be caused by irritation from excessive alcohol use, chronic vomiting, stress, or the use of certain medications such as aspirin or other anti-inflammatory drugs. It may also be caused by any of the following: Heliobacter pylori (H. pylori), a bacteria that lives in the stomach's mucous lining; without treatment, H. pylori

helicobacter pylori organisms. ECF No. 104-3 at 210. The biopsy of the right colon showed no significant histopathologic abnormalities and was negative for dysplasia; likewise, the biopsies of the sigmoid colon showed no significant histopathologic abnormalities and were negative for dysplasia. Id. The second page of the report indicates that Pledger's clinical history included a history of Crohn's and anemia.  Id. at 211. It also stated that the procedures performed were "EGD and C-scope with biopsy. Preoperative Diagnosis: Hx Crohn's, anemia. Postoperative Diagnosis: Gastric ulcers, normal colon."[26] Id.

On May 19, 2015 at 6:52 pm, Plaintiff was seen in Health Services by S. Hudnall RN for a medical trip return encounter.  ECF No. 104-3 at 85 - 88. He appeared well, was alert and oriented. Id. at 85. He reported that in addition to his colonoscopy, he had had an endoscopy which found multiple gastric [sic] ulcers and that biopsies were taken, and "he was told did not have Cro[h]n's disease."[27] Id. Plaintiff had "[n]ew orders for medications given.  Per discharge instructions inmate to **Hold [sic] Mesalamine ER for the next 4 weeks**." Id. at 85 (emphasis added). His Omeprazole dose was doubled. Id. at 85 – 86. He was instructed to follow up at sick

---

infection can lead to ulcers, and in some people, stomach cancer. Gastritis may also be a result of bile reflux (a backflow of bile into the stomach from the bile tract (that connects to the liver and gallbladder)), or from infections caused by bacteria and viruses. See What is Gastritis? *available at*: < https://www.webmd.com/digestive-disorders/digestive-diseases-gastritis#1 >

[25] Intestinal metaplasia is a condition in which the cells in the lining of the stomach are replaced with cells similar to those in the intestinal lining. Intestinal metaplasia is considered a precancerous condition; it is usually asymptomatic, and only discovered by endoscopic procedures where biopsies are taken.  See Intestinal Metaplasia, *available at*: < https://www.healthline.com/health/intestinal-metaplasia >

[26] This postoperative diagnosis omits mention of the duodenal ulcers.

[27] A review of the Operative Record of the May 19, 2015 procedures does not support this claim, given that Dr. Lanasa's post-operative diagnosis states "[h]istory of Crohn's disease, multiple gastric and duodenal ulcers and normal colon." See ECF No. 104-3 at 218. While Lanasa's report does conclude that no evidence of Crohn's was found *in the colon*, it does not say that Pledger did not have Crohn's at all. It is unclear if Plaintiff interpreted Lanasa's explanation of the finding of no Crohn's ulcerations in the colon to mean that Lanasa meant that Plaintiff did not have Crohn's disease *anywhere else* in his GI tract. Given that Lanasa only recommended a trial of four weeks off of the Mesalamine with Prilosec to protect the stomach and duodenum while the ulcers healed, and then a re-check, it does not sound like Lanasa believed that Plaintiff did not have Crohn's.

call as needed or return immediately if his condition worsened. Id. at 86. The "Surg-Postoperative Orders (Adult)" from SJH state that Plaintiff's omeprazole was to be increased to 40 mg daily and his **Mesalamine ER was to be held for four weeks**.[28] ECF No. 104-3 at 229 (emphasis added). The order was co-signed by Dr. Savidge. Id.

On May 20, 2015 at 9:51 am, Dr. Savidge made an Administrative Note indicating that Plaintiff's Mesalamine would be suspended per the outside provider's orders and that Plaintiff's Omeprazole dose was already increased. ECF No. 104-3 at 83. This note was reviewed and co-signed by Dr. Anderson on May 21, 2015. Id. at 84.

On May 21, 2015, Plaintiff signed a medical treatment refusal form, refusing a national low fiber diet. ECF No. 104-3 at 233. The form warned that the possible consequences of refusing the diet might be "[w]orsening of current medical issues related to Crohn's disease[29] and not following recommended diet." Id. The form was co-signed by PA Alicia Wilson. Id.

On May 28, 2015 1:02 pm, Plaintiff was seen by PA Lehmann emergently for GI pain. ECF No. 104-3 at 80 – 82. His history of GI disease, and the EGD and colonoscopy performed the previous week were noted. Id. at 80. Plaintiff reported that the surgeon told him that he had ulcers and did not have Crohn's disease, but that he was diagnosed with Crohn's in 2008 [sic] and never questioned the diagnosis. Id. He reported that his current episode of pain began six

---

[28] A review of Pledger's BOP Health Services Medication Summary Historical, produced by the Individual Federal Defendants, reveals that the Mesalamine was documented as discontinued on May 20. 2015; it does not show that it was temporarily discontinued for four weeks, or that it was ever re-started. It was finally discontinued altogether on October 30, 2015. ECF No. 104-3 at 153.

[29] The low-fiber diet consists of foods that are often highly processed; it restricts fruits, vegetables and grains, only permitting fruits and vegetables if they are canned and/or well-cooked without skins or seeds; chicken and fish are permitted; and nuts and seeds are avoided. See Mayo Clinic – Low Fiber Do's and Don't's, *available at*: < https://www.mayoclinic.org/healthy-lifestyle/nutrition-and-healthy-eating/in-depth/low-fiber-diet/art-20048511 >

days earlier when he started a new prescription.[30] Id. He reported GI pain but no vomiting or diarrhea. ECF No. 104-3 at 80.  His weight was 197 pounds. Id. His pulse was 97 but his vital signs otherwise were stable. Id.  His abdominal exam was normal; his abdomen was soft with no guarding, rigidity, tenderness on palpation, masses or hepato-splenomegaly. Id. at 80 – 81. Sucralfate tablets[31] were prescribed for his abdominal pain and x-rays of his abdomen were ordered. Id. at 81. He was instructed to return to sick call as needed and was placed on callout. Id. A note was made to get the reports for the GI procedures performed on May 19, 2015. Id. This note was not co-signed by any other medical provider. A urinalysis was negative. Id. at 224. The abdominal x-rays were negative. Id. at 226.

On May 29, 2015 at 11:43 am, PA Lehmann entered an Administrative Note about February 28, 2015 orders "pending completion," and noting that Sucralfate tablet 1 gm, had been ordered, to be taken four times daily for seven days on an empty stomach. ECF No. 104-3 at 79. This note was not co-signed by any other medical provider. Id.

On June 5, 2015 at 3:44 pm, Plaintiff was seen by Dr. Savidge in sick call for abdominal pain chronic/not improved/same.  ECF No. 104-3 at 77 - 78.  Dicyclomine[32] 20 mg tablets were

---

[30] Records show Pledger did not start a new prescription; rather, his Mesalamine was discontinued and his Omeprazole dose was increased. See Anderson Decl., ECF No. 104-1, ¶45 at 6.

[31] Sucralfate (brand name Carafate) is a unique oral drug used for treating ulcers of the upper GI tract. It is minimally absorbed into the body; its actions are entirely on the lining of the stomach and duodenum. Although its mechanism of action is not entirely understood, the following actions are thought to be important for its beneficial effects: 1) it binds to the surface of ulcers (attaching to exposed proteins) and coats the ulcer, thus protecting the ulcer surface to some extent from further injury by acid and pepsin; 2) it directly inhibits pepsin (an enzyme that breaks apart proteins) in the presence of stomach acid; 3) it binds bile salts coming from the liver via the bile thus protecting the stomach lining from injury caused by the bile acids; and 4) it  may increase prostaglandin production, and prostaglandins are known to protect the lining of the stomach. See Sucralfate, available at: < https://www.medicinenet.com/sucralfate/article.htm >

[32] Dicyclomine (brand name Bentyl) is an anticholinergic/antispasmodic used to treat irritable bowel syndrome by reducing the symptoms of cramping, by slowing the natural movements of the gut and relaxing muscles of the stomach and intestines.  See Dicyclomine Hcl, available at:  <   https://www.webmd.com/drugs/2/drug-5247/dicyclomine-oral/details >

prescribed, three times a day before meals for two months. Id. at 77.  New labs (a CBC, lipase, hepatic profile, and amylase levels) were ordered. Id. at 77. An abdominal ultrasound was ordered for evaluation of "recurrent daily, worsening right sided abdominal pain for months, aggravated by certain foods." Id. at 78.  He was instructed to follow up as needed at sick call or Chronic Care Clinic. Id. This note was not co-signed by any other medical provider. Id.

On June 15, 2015, Plaintiff was seen by Dr. Savidge in medical sick call for intermittent moderate to severe right mid-abdominal pain, "[t]he same problems as before." ECF No. 104-3 at 221. He reported that nothing made the pain better, and food made it worse. Id.  On exam, he was tender in the right mid-abdomen, but had no guarding or rebound. Id. Savidge documented that Plaintiff was in no acute distress, had no peritoneal signs and normal bowel sounds. Id. The plan was for an abdominal ultrasound, consider a CT scan; lab work, and a trial of Bentyl 20 mg three times daily before meals, for two months. Id.

On June 16, 2015 at 3:33 pm, Plaintiff was seen in sick call by Dr. Savidge for abdominal pain. ECF No. 104-3 at 74.  He was instructed to follow up at sick call and CCC as needed. Id. Plaintiff was seen by Dr. Savidge in medical sick call that day for his abdominal pain, "[t]he same problem that I was seen for last week and before that and so on. . . I am in pain." ECF No. 104-3 at 217. He reported that nothing made the pain feel better and food made it feel worse, that the pain was worse after meals, "sometimes severe." Id. His exam was unchanged from the previous week. Id.  It was noted that his commissary food purchases showed non-compliance with the recommended low fiber/residue diet and that Plaintiff had not yet started taking the Dicyclomine tablets prescribed earlier for abdominal pain; he was encouraged to do so.  Id. Savidge also noted that Pledger's Prilosec was continued and "**cont** [sic] **hold Mesalamine**." Id. (emphasis added).

On June 17, 2015 at 12:46 pm, Plaintiff was seen in follow up during open house by PA Alicia Wilson for abdominal pain. ECF No. 104-3 at 73. His non-compliance with his diet was reviewed, as well as his poor choices of food purchases from commissary. Id. Wilson noted that Plaintiff "voiced understanding but was not in agreement."[33] Id. It was also noted Plaintiff was not taking the recommended medication (Bentyl) prescribed by Dr. Savidge. Id. His pending ultrasound evaluation was noted. Id. This note was not co-signed by any other medical provider. Id.

As of June 20, 2015, it had been four weeks since Pledger's Mesalamine had been held. There is no notation in the record regarding this.

On June 23, 2015, Plaintiff had blood drawn for lab work. ECF No. 104-3 at 215.  His H&H was low at 11.5/35.8 (13.5 – 18.0/40 - 52); his MCV was low at 72.3 (80 - 100); the MCH was low at 23.3 (25.4 – 34.6). ALT low at 6 (8 – 55); albumin low at 3.3 (3.5 – 5.0).  ECF No. 104-3 at 215.

On June 25, 2015 at 2:10 pm, Dr. Savidge made an administrative note about his review of Plaintiff's labs, his recent normal colonoscopy, and the ulcers found in the EGD, **for which the Mesalamine had been temporarily discontinued** and Prilosec started. ECF No. 104-3 at 70 (emphasis added). Plaintiff reported his diet had been poor recently, due to intolerance of solid foods; his refusal of the recommended low residual diet was noted. Id. Savidge noted that Plaintiff had lost about 20 pounds in the last year; that an abdominal ultrasound was pending; a CT scan was being considered; and he would be seen the first week of July in CCC.  Id. Savidge commented "H&H  decreased  from  baseline  &  MCV/MCH  remain  low  –  despite  iron

---

[33] PA Wilson did not document why Pledger was "not in agreement."

supplementation & recently normal colonoscopy & negative FOB[34] x 3.  . . . recheck iron studies

w/ B12 & folate, consider Hem/Onc referral."  ECF No. 104-3 at 70.  Labs (transferrin, folate,

Iron & TIBC (% sat), and Vitamin B12) were ordered.  Id. Per Dr. Savidge's request, this note

reviewed was by Dr. Anderson the next day. Id.; id. at 71.

On June 29, 2015, Plaintiff had blood drawn for lab work.  ECF No. 104-3 at 213.  His

transferrin level was normal. ECF No. 104-3 at 213.

On July 8, 2015 at 1:03 pm, Plaintiff was examined by PA Alicia Wilson at a CCC

appointment at Health Services. ECF No. 104-3 at 64 – 69. *Inter alia*, Plaintiff's CC included

getting sick over the weekend after eating food given to him by another inmate, without first

washing his hands. Id. His right-sided abdominal pain was not new, but he reported a "knot" in

the same area that hurt when he coughed; he thought it might be a hernia, because he had

previously had a left-sided inguinal hernia and thought it might be something similar. Id. His

recent colonoscopy was noted to be negative, but the recent EGD showed gastritis. Id. It was also

noted that **the Crohn's medication had been stopped after the colonoscopy**, but that he was

taking Dicyclomine, which he reported did not help; he was also taking Omeprazole (Prilosec),

the prescription for which she noted was "expired."  Id. (emphasis added). His weight was 195

pounds. Id. at 65. Inspection and palpation of his abdomen were WNL. Id. at 65 – 66. He

reported that when his abdomen hurt, he did not come over to pill line to get his antidepressant,

Doxepin; compliance was discussed with him. Id. at 64. Under "exam comments," Wilson noted

that Plaintiff's CBC, CMP, PSA" were all WNL, but that his hemoglobin (part of the CBC) was

now down to 11.5 "(on iron)." Id. at 66. New labs (CBC, CMP, iron, lipid profile, and PSA)

were ordered, to be done November 1, 2015. Id.  He was instructed to follow up at sick call and

---

[34] "FOB" is an acronym for "fecal occult blood."

CCC as needed and appointments were made for both. Id. at 68.  This note was reviewed and co-signed by Dr. Anderson the next day. Id. at 69.

On July 9, 2015, Plaintiff had blood drawn for lab work. ECF No. 104-3 at 208.

On July 20, 2015 at 10:15 am, Dr. Savidge made an Administrative Note, indicating that Plaintiff's worsening iron deficiency was discussed with him; Plaintiff reported not taking his iron pills because he did not like them. ECF No. 104-3 at 61. Plaintiff's worsening anemia was noted as well (H&H 11.5 and 35.8, B12 normal, Folate pending). Id. at 61. Savidge noted that Plaintiff's recent endoscopy/colonoscopy showed gastric and duodenal ulcers, but a normal colon; his Mesalamine had been stopped and Prilosec prescribed. Id. Because of his continued abdominal pain and his 21 pound weight loss over the past 15 months, a gastroenterology consultation was requested; it was noted that an abdominal ultrasound was pending; and a CT of the abdomen was considered.  Id. Plaintiff was encouraged to resume his iron supplement. Id. This note by Savidge was reviewed by Dr. Anderson the same day. Id. at 63. Blood was drawn for lab work. ECF No. 104-3 at 206. Plaintiff's serum folic acid level was 17.0 (normal = > 3.0). ECF No. 104-3 at 206. His iron level was low at 22 (65-175); TIBC low at 228 (237 -450); % saturation low at 9.6 (20 – 50); and his Vitamin B12 was WNL. ECF No 104-3 at 208.

On July 27, 2015 at 9:39 am, Plaintiff was seen in follow up in SHU medical by PA Lehmann for a recheck of his GI symptoms and a review of his labs and pathology reports. ECF No. 104-3 at 57 - 60. Plaintiff reported that his symptoms were about the same; **that he had been off the Mesalamine for several weeks** [sic – it had been over two months] and had not noticed any worsening of his symptoms. Id. at 57 (emphasis added). Lehman advised him that the pathology results from his EGD and colonoscopy revealed only gastritis; that the colon was

normal, so the diagnosis of Crohn's disease was likely incorrect.[35] Id. Plaintiff reported that he had stopped taking his iron supplement because it constipated him so much, and his normal bowel habit was already only once every 3-4 days. Id. He reported drinking plenty of water. Id. He also indicated he could not handle the Sucralfate because it was so big, it stuck in his throat, but he would take it in liquid form if it were available. Id.  It was noted that he was pending a GI consult and abdominal ultrasound for right sided pain and a "knot" that sounded like a possible hernia. Id. The "knot" was not palpable on exam. Id. On review of systems, inter alia, Plaintiff was noted to have abdominal pain or colic, dyspepsia, and weight loss. Id. A check of his weight revealed a 10-pound weight loss, from 197 to 187 pounds since May 28, 2015, a two-month time span. Id. at 58. On exam, his abdomen was soft, with RLQ tenderness but no guarding, masses, or enlarged spleen or liver. Id. A new medication was prescribed: Sucralfate suspension[36] 10 cc four times a day on an empty stomach for three months; his Omeprazole 40 mg daily was ordered for three months; and his ferrous gluconate (iron) was discontinued. Id. at 59. He was instructed to follow up at sick call and CCC as needed. Id. This note was not co-signed by any other medical provider. Id. at 60.

On August 14, 2015, Plaintiff was seen in sick call at Health Services by PA Lehmann, for "the same as always" stomach pain; he reported that there was a "big ball" on the right side

---

[35] Crohn's cannot be ruled out on the basis of a finding of a normal colon on colonoscopy, given that 80% of Crohn's lesions are found in the small bowel, which is not examined in a colonoscopy.  Moreover, Plaintiff's colon was not "normal" if there was swelling found in the sigmoid, because swelling in the bowel is a symptom of Crohn's.   See   Crohn's   Disease  -  Difficult   diagnosis,   available   at:   < http://www.inmo.ie/MagazineArticle/PrintArticle/7106 >

[36] For reasons unknown, Pledger's BOP Health Services Medication Summary Historical does not reflect this Sucralfate suspension prescription. The only Sucralfate prescriptions listed are the June 1 – 8, 2015 prescription for 1 gm tablets, to be taken by mouth four times daily for 7 days on an empty stomach, by PA Lehmann [ECF No. 104-3 at 155] and a subsequent one, also by PA Lehmann, not otherwise mentioned in the medical records, for a new 3-month prescription, written on August 17, 2015 for "Sucralfate 1 gm, take one table by mouth four times daily before meals and at bedtime to help heal gastric ulcers ** Split tablets and take with large amounts of water if having trouble swallowing** [sic]." Id.

of his stomach that had been going on for "a long time" and was worsened by "food." ECF No. 104-3 at 199. Other than a pulse of 91, his vital signs were stable. Id. On exam, Lehmann noted a firm, tender, palpable RLQ, 6 cm x 3 cm mass. Id.  Plaintiff denied any changes with his bowel or bladder. Id. Lehmann noted that the May 19, 2015 colonoscopy was negative for a colon mass. Id. She reminded him that he had the ultrasound and GI consults pending, and that staff would try to move the consults up.[37] Id.  She encouraged him to keep track of his symptoms. Id. At 2:00 pm that day, PA Lehmann made an Administrative Note about an orders encounter at Health Services; noting that Plaintiff had presented for "[s]welling/mass/lump in abdomen/pelvis" and was instructed to follow up at sick call as needed, that he would be placed on call out. ECF No. 104-3 at 56. His pulse was 91; his blood pressure and respirations were WNL; his temperature was not documented. Id. This note was not co-signed by any other medical provider. Id.

On August 17, 2015 at 6:30 pm, Plaintiff was seen by S. Hudnall RN in Health Services for abdominal pain and a painful "knot" on the right side of his stomach. ECF No. 104-3 at 52 – 55. His temperature was 99.2 and his pulse was 100; his vital signs were otherwise WNL. Id. at 52. His affect was described as cooperative but irritable. Id. at 53. He had come to Health Services from Recreation. Id.  He reported having been seen by PA Lehmann in sick call on Friday; that he was waiting to go out for a consult and ultrasound of the abdomen; and that while he had had this problem for a "long time," it had "gotten worse in the last 3 - 4 months."[38] Id. He reported that he could not eat because of the discomfort, had lost 45 pounds, but that he continued to drink water. Id. Hudnall documented that his vital signs were stable; that he did not

---

[37] There is nothing in the medical records produced, to indicate that Lehmann ever attempted to expedite the dates for the ultrasound and GI consults.

[38] There is nothing in the notes of this visit to indicate that Hudnall palpated Pledger's abdomen to assess the "knot."

appear dehydrated; and that he was in no acute distress. Id. She noted that Plaintiff reported having been on Omeprazole, which had helped, but that the prescription expired and was not renewed. Id. She instructed him to try to eat a bland BRAT diet,[39] drink a lot of water throughout the day; stay in his unit and not go to recreation if he were not feeling well; and to follow up at sick call and return immediately if his condition worsened. Id. Dr. Anderson reviewed and cosigned Hudnall's note the following morning. Id. at 54.

On August 21, 2015, at 6:44 a.m., Plaintiff was seen by Dr. Anderson at sick call in Health Services for chronic abdominal pain that had worsened overnight. ECF No. 104-3 at 49 – 51. He reported that his urine was dark, and he was worried something "was going to bust open." Id. at 49. He acknowledged having seen a gastroenterologist in May; while he did not agree with the current treatment plan, he understood it.  Id. His general affect was described as irritable and agitated, yet his appearance was described as "well, alert and oriented x3." Id.  Dr. Anderson noted that he did not appear to be distressed or in pain. Id. On exam, his abdomen was found to be WNL with normal, active bowel sounds; it was soft, with no guarding or rigidity. Id. at 49 – 50. Anderson noted that he would inquire about the priority for abdominal ultrasound; that Plaintiff had seen general surgery already; and had a pending gastroenterology consult.[40] Id. at 50. A urine specimen was obtained; Plaintiff was instructed to drink plenty of fluids and eat a bland diet. Id. Anderson also commented that Plaintiff's commissary food choices were poor for someone with chronic abdominal pain; he advised Plaintiff to follow up at sick call and CCC as needed. Id. Plaintiff's urine test was unremarkable. Id. at 146.

---

[39] BRAT is an acronym that stands for bananas, rice, applesauce, and toast. These foods are often recommended following a stomach illness, because they are all bland and supposedly easy on the stomach. See:  BRAT Diet: What is it and Does it Work? *available at:*  < https://www.healthline.com/health/brat-diet >

[40] There is nothing in the available record to indicate that Dr. Anderson looked into expediting Plaintiff's abdominal ultrasound, let alone his gastroenterology consult.

On August 21, 2015, at 6:30 am,[41] Plaintiff was seen by Joshua Hall RN in Health Services for nagging RLQ abdominal pain that had gotten worse overnight, that Plaintiff described as a "10" on a scale of 1 - 10.  ECF No. 104-3 at 46 – 48. He had walked to Health Services and said, "I am in pain Doc something is wrong you have to send me out." Id. at 47.  He was alert and oriented and appeared to be in pain. Id. On exam, Hall noted that Pledger had active bowel sounds. Id. Nurse Hall noted that Plaintiff's abdomen was soft, with some guarding and tenderness in the RLQ, but that there were no significant findings upon exam and that Plaintiff was in no apparent distress. Id.  Hall recommended "rest" as an "intervention" for Plaintiff's pain. Id. at 46. Plaintiff was instructed to follow up as needed but Hall noted Plaintiff "[w]as not happy about assessment" and walked back to the unit. Id. at 47. This note was reviewed and co-signed by Dr. Anderson later that morning. ECF No. 104-3 at 48.

On August 22, 2015 at 1:45 pm, Andrea Hall, RN entered an Administrative Note reporting that the Operations Lieutenant had seen Plaintiff after hours the evening before, and had contacted the on-call medical provider regarding Plaintiff's report of "pains in his side." ECF No. 104-3 at 44. The Operations Lieutenant had apparently instructed Plaintiff to report to Health Services "first thing" that morning. Id. However, Plaintiff did not show up as instructed; his housing unit was called, and they verified that Plaintiff was there. Id. Plaintiff did go to Health Services at 11:30 am for medication pill line, but did not mention any pain or discomfort at that time and no acute distress was noted. Id.

On August 26, 2015 at 1:39 pm, Plaintiff was seen by Andrea Smith-Posey RN in Health Service for stabbing LLQ [sic] abdominal pain that he described as an "8" on a scale of 1 – 10. ECF No. 104-3 at 41 – 43. He advised Smith-Posey that the pain had been going on for 2 – 6

---

[41] Plaintiff apparently reported to Health Services at 6:30 am but the note was made at 9:29 am.  See ECF No. 104-3 at 47.

months and was exacerbated by walking or moving around, and that "it hurts all day every day." Id. at 41. Smith-Posey recommended "rest and hydration" as an "intervention" for Pledger's pain. Id. She spoke with PA Wilson. Id. Plaintiff advised that he had a consult scheduled. Id. Smith-Posey documented "NAD (no acute distress) noted." Id. She instructed Plaintiff to follow up at sick call as needed. Id. at 42; see also ECF No. 104-3 at 198. This note was reviewed an co-signed by PA Wilson later that afternoon. Id. at 43.

On August 28, 2015 at 2:07 pm, Plaintiff was seen by Smith-Posey again in Health Services for stabbing LLQ [sic] abdominal pain, again described as a level "8" on a scale of 1 – 10, that he had had for 2 – 6 months, and that was exacerbated by moving around. ECF No. 104-3 at 38 – 40. His temperature was normal; his pulse was 91; and his blood pressure was 108/77. Id. at 38. She noted that he had bowel sounds, but did not mention examining the abdomen otherwise. Id. Although there is no mention of Pledger reporting constipation, she instructed him to increase fluids to help with constipation and to buy fiber pills at the commissary. Id. She again recommended "rest and hydration" as an "intervention" for Pledger's pain. Id. When Smith-Posey advised him that he had a follow up with an outside provider "in the near future" he replied "I'll be dead before the tests are done." Id. Smith-Posey noted that there were no significant findings and that Plaintiff was in no apparent distress. Id. He was instructed to follow up at sick call as needed. Id.; see also ECF No. 104-3 at 197. Smith-Posey's note was reviewed and co-signed by PA Wilson later that day. Id. at 40.

On September 2, 2015 at 8:49 pm, Plaintiff emailed Health Services to inquire whether there was any possibility that his abdominal pain might be from his appendix. ECF No. 104-3 at 196. On September 3, 2015 at 12:14pm, staff responded, advising that he was pending an ultrasound, which would also evaluate his appendix. Id.

28

On September 8, 2015 at 11:45 am, Dr. Anderson was called to the compound for a report of an inmate "falling out."  ECF No. 104-3 at 35 – 37. Upon arrival, he found Pledger curled into a fetal position; Pledger reported that his abdominal pain was so unbearable he had to lie down; he had not been able to eat at all that day; that he had had the pain for at least two months, and it was now radiating into his back. Id. at 35. On exam, he was alert, oriented, and anxious. Id.  His pulse was 114 and his blood pressure 142/90; otherwise, his vital signs were WNL. Id. Anderson noted that Pledger's abdomen appeared to be WNL; it was soft, with some guarding and RLQ tenderness; active bowel sounds were heard. Id. at 36. The May 19, 2015 EGD and colonoscopy results were noted. Id. The decision was made to transfer Plaintiff to the local hospital for evaluation; report was made to Dr. Kelly at Stonewall Jackson Memorial Hospital ("SJMH"). Id.

At 11:53 am on September 8, 2015, Plaintiff was brought to Health Services via wheelchair after collapsing on the compound and evaluated by RN Smith-Posey.  ECF No. 104-3 at 32 – 34.  He reported that he "just went down from the pain" which he described as a stabbing pain in the LLQ [sic][42] of his abdomen, and a level "8" on a scale of 1 – 10. Id. at 32.  He reported that the pain had been going on intermittently for 2 – 6 months and that walking or moving around exacerbated it. Id.  His pulse was 114 and his blood pressure was 142/90; otherwise, his vital signs were stable. Id. He complained of RLQ quadrant pain. Id. His abdomen was tender to touch, but he denied nausea and vomiting and reported normal bowel movements. Id. at 32 - 33.  He had bowel sounds in all four quadrants. Id.  He reported that he could not eat that day because of the pain.  Report was called to Dr. Anderson, Dr. Kelly, and "Amanda." Id. Plaintiff was to be transferred to the local hospital by government vehicle. Id. An "Inmate Local

[42] This is presumed to be a typographical error, given that Plaintiff's Crohn's pain was typically on the right side, and the location was later confirmed by the surgical findings in that area.

Hospital" form was completed by Andrea Smith-Posey, RN, summarizing Plaintiff's current health problems, medications, pending appointments, and other pertinent medical information. ECF No. 104-3 at 110 – 11. At the hospital that afternoon, Plaintiff's H&H was 9.1/29.0 (normal = 14.0 – 18.0/42.0 – 52.0), indicating significant anemia. ECF No. 104-3 at 173. His weight on admission to SJMH was 181.07#. See ECF No. 104-3 at 163.

On September 9, 2015 at 6:57 am, Dr. Anderson entered an Administrative Note after speaking with the hospital. ECF No. 104-3 at 31. Plaintiff's CT scan showed inflammatory changes in the RLQ of his abdomen that was possibly appendicitis or ileitis;[43] his WBC count was elevated at 9.3 but otherwise, he was stable with limited pain. Id. The surgery department was expected to evaluate him that day. Id.

On September 10, 2015 at 8:49 am, Dr. Anderson made an Administrative Note, indicating that the hospital reported Plaintiff was stable overnight and had started a bowel prep for a colonoscopy to be performed the next day. ECF No. 104-3 at 30.

On September 11, 2015 at 6:51 am, Dr. Anderson made another Administrative Note, indicating that the hospital reported that Plaintiff was stable overnight with no complaint of pain, and was scheduled for a laparotomy later that afternoon. ECF No. 104-3 at 29. The United Hospital Center ("UHC") surgical pathology report from the September 11, 2015 procedure indicated a

[f]inal diagnosis [of] Right Colon segmental resection:

1) Appendix with infarction, hemorrhage and atrophy.

---

[43] Ileitis, or inflammation of the ileum, is often caused by Crohn's disease. However, ileitis may be also caused by a wide variety of other diseases, including infectious diseases, spondyloarthropathies, vasculitides, ischemia, neoplasms, medication-induced, eosinophilic enteritis, and others. See Ileitis: When It Is Not Crohn's Disease, *available at*: < https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2914216/ >

2) Colon with acute ulceration, stricture formation, acute serositis and abscess formation, possible adjacent diverticulum identified. Chronic changes also present including mucosal lymphoid follicular hyperplasia, serosal fibrosis and chronic inflammation with lymphoid aggregates and follicles.   Significant pathologic polarizable foreign material is absent.

3) Small intestine with epithelial erosion, focal acute ulceration, and serosal and mucosal lymphoid aggregates and follicles.

4) 8 lymph nodes with lymphoid follicular hyperplasia.

Note: The findings are nonspecific.   Possibilities include a ruptured colonic diverticulum, infection, and idiopathic inflammatory bowel disease.[44] Please correlate clinically. **If idiopathic inflammatory bowel disease is ruled in[,] then the histologic findings would support the diagnosis of Crohn's disease in the proper clinical context**.   Exclusion of rupture/perforation of the colon is recommended.[45]

**Gross description**: The specimen is received in formalin . . . **It consists of the following: 19 cm length of right colon with attached 13 cm length of terminal ileum and a 4 cm infarcted hemorrhagic appendix.   6 cm from the distal margin is a 4 cm area of obstructed colon with obliteration of lumen** and soft tissue stranding along the radial margin consistent with fibrosis/fibroinflammatory reaction.   The mucosa distal and proximal to this including in the terminal ileum is flattened. No ischemic changes are identified.   Multiple enlarged lymph nodes are present around the obstruction.   The distal margin is inked blank and the proximal margin is inked blue.   Representatively submitted in 15 blocks.[46]

ECF No. 104-3 at 190-91 (emphasis added).

On September 15, 2015 at 7:01 am, Dr. Anderson entered an Administrative Note about Plaintiff's 4th post-op day. ECF No. 104-3 at 28.   His nasogastric ("NG") tube had been removed the day before; he was on clear liquids; his bowels were working; and he was expected to transfer to a "med-surg" floor that day. Id.

---

[44] Crohn's disease and ulcerative colitis are both major categories of inflammatory bowel diseases ("IBD"). See What are Crohn's & Colitis? *available at*: < http://www.crohnscolitisfoundation.org/what-are-crohns-and-colitis/ >

[45] The record does not include the full hospital records or the September 11, 2015 operative note, which would reveal whether there was, indeed a rupture/perforation.

[46] The findings of the pathologist's examination of these "15 blocks" would have been revealed in a microscopic report; the Federal Defendants only included the above "Gross Description" report, not the microscopic findings.

On September 17, 2015 8:52 am, Dr. Anderson made an Administrative Note regarding Plaintiff's 6th post-op day; the pathology report was not back yet, but Plaintiff's dressing change had looked good; he had been up to shower; was on a soft regular diet; and the hospital was waiting for him to have a bowel movement. ECF No. 104-3 at 27. His H/H was 9.3/29.0.  ECF No. 104-3 at 169.

On September 18, 2015, Dr. Anderson made an Administrative Note at 6:38 a.m., regarding Plaintiff being up walking around; taking Toradol occasionally for pain; it was uncertain if his bowels were moving; and it was possible that he would be discharged that day. ECF No. 104-3 at 26.

On September 18, 2015, Plaintiff's discharge instructions from SJMH advised him to resume normal activities but avoid strenuous activity. ECF No. 104-3 at 159 – 178.   The paperwork indicated that Plaintiff's CC and reason for visit were "abdominal pain RLQ[,] extendive [sic] inflam[m]atory process RLQ[, and] anemia." Id. at 178. He was advised that he had been admitted with "a principal diagnosis of intestinal abscess" and that he had had an "open and other right hemicolectomy." Id. at 177.

At 8:23 pm that day, by then back at FCI Gilmer, Pledger was examined by Andrea Hall RN. ECF No. 104-3 at 23 – 25. She noted that his wound was clean and dry with scant drainage and an intact dressing. Id. at 23. There were no signs of infection and he did not appear to be in pain or distress. Id. He was instructed to watch for signs of infection and to report to sick call as needed or if his condition worsened. Id. at 23 – 24.

On September 19, 2015 at 1:28 pm, Plaintiff was seen in Health Services by S. Hudnall RN for a dressing change. ECF No. 104-3 at 19 – 22. He reported that the wound was still draining a lot; on exam, he appeared well, was cooperative, alert and orientated but anxious and

32

irritable about the amount of drainage; he was reassured that it was normal. Id. at 19 - 20. He did not appear to be in distress or in pain. Id. at 19. The old dressing was removed and the incision was noted to be closed with staples; its edges were well approximated with no signs or symptoms of infection. Id. There was serosanguinous drainage noted between two staples below the belly button. Id. Dr. Anderson was consulted; it was noted that the drainage was alright, but that Plaintiff should take it easy for the next couple of days. Id. Plaintiff was instructed to keep the area clean and dry; to rest, and only be out to go to meals. Id. A new dressing was applied and Plaintiff was given additional dressing supplies. Id. He was instructed to follow up at sick call as needed and to return immediately should his condition worsen. Id. at 20. On September 19, 2015, an Administrative Note by PA Alicia Wilson indicated Plaintiff's labs were reviewed and his` recent hemicolectomy due to Crohn's disease was noted. Id. at 11.

On September 21, 2015 at 9:30 am, Plaintiff was seen by Dr. Anderson in Health Services for a post-op visit; his CC was abdominal pain.  ECF No. 104-3 at 15 - 18. He appeared well but in pain; his incision was approximated and healing appropriately; he was instructed to advance his diet and activity slowly as tolerated. Id. at 15 - 16.   His wound was no longer draining and he was able to change his own dressings. Id. at 15. Motrin was discontinued and Tylenol was ordered as needed every six hours. Id. at 16 - 17. He was instructed to follow up at sick call and CCC as needed.  Id. at 19.

On September 22, 2015 at 4:19pm, Plaintiff emailed Health Services to inquire about his 10-day post up follow up appointment with his surgeon. ECF No. 104-3 at 195. On September 23, 2015 at 10:40 am, PA Wilson responded, stating that Dr. Anderson was waiting on the final report from the procedure, and that she did not think that anything had been scheduled yet.  Id.

On September 27, 2015 at 8:15 am, Plaintiff emailed Health Services, complaining that on when he went to the September 25, 2015 pill line, he asked for medical tape because after his shower, part of his incision opened up and began leaking, but Nurses "Poisey [sic]" and "Carson" refused him tape.  ECF No. 104-3 at 194.  On September 28, 2015 at 11:58 am, PA Wilson responded, stating that she would forward his email to "Ms. Grove." Id.

In a September 27, 2015 Regional Administrative Remedy Appeal, Plaintiff stated he now weighed "170 pounds." ECF No. 17 at 14.

On September 28, 2015, Plaintiff was seen in Health Services by Andrea Hall RN for staple removal and a request for more tape for his dressings. ECF No. 104-3 at 13 – 14. The staples were removed; the incision appeared to be healing well; there were no signs of infection and or drainage. Id. at 13. Plaintiff was instructed to follow up at sick call if needed. Id.

On September 29, 2015, Plaintiff's blood was drawn for labs at 7:00 am. ECF No. 104-3 at 187. His H&H was  low at 9.0/28.8 (13.5 – 18.0/40-52); his MCV was low at 71.9 (80 - 100); MCH was low at 22.5 (25.4 – 34.6); his RDW was elevated at 18.3 (11.0 - 15.0; and his platelets were 543 (150 – 400). ECF No. 104-3 at 188.

On October 5, 2015, a report review encounter was performed by Dr. Anderson at Health Services, who entered an Administrative Note commenting on Plaintiff's low hemoglobin of 9.0 since his "recent hemicolectomy d/t crohn's [sic]." ECF No. 104-3 at 12. Anderson ordered a CBC to be done on November 2, 2015 and December 2, 2015. Id.

On October 19, 2015 at 9:44 am, Plaintiff emailed "Ms. Grove" in Health Services, asking why he had not been put back on his Crohn's medicine since the surgery. ECF No. 104-3 at 184. On October 20, 2015 at 7:43 am, staff responded, saying that Plaintiff's Mesalamine had been restarted. Id. On October 20, 2015 at 7:41 am, PA Alicia Wilson made an Administrative

Note, indicating that it was "OK to restart Mesalamine after most recent colonoscopy [sic]." ECF No. 104-3 at 11.

On October 22, 2015, Plaintiff emailed a staff physician about his medication. ECF No. 104-3 at 183. On October 23, 2015, Dr. Anderson responded, indicating that a non-formulary medication was requested to substitute for one of Plaintiff's medications, and that a gastroenterology consultation had been requested for Plaintiff's persistent symptoms; Plaintiff was told to avoid "foods that tend to stimulate digestion, juices, dairy, etc." Id.

Also on October 23, 2015, at 6:50 am, an Administrative Note was entered by Dr. Anderson, indicating that staff spoke with Plaintiff about beginning Olsalazine,[47] a trial medication, after having been on Mesalamine "for 'years' without benefit." ECF No. 104-3 at 8. A new medication order for Olsalazine capsule 500 mg orally three times daily with food, x 180 days was written, and the Mesalamine capsule ER 24 Ho. 0.275 gm, five capsules a day was discontinued.[48] Id.

On October 30, 2015, Dr. Anderson made an Administrative Note reporting that the non-formulary drug was approved and the new medication was ordered. ECF No. 104-3 at 8.

On November 4, 2015, Plaintiff had another CBC drawn. ECF No. 104-3 at 180. His H&H was 11.0/Hct 34.9 (13.5 – 18.0/40- 52); his MCV was still low at 71.4 (80 – 100); his MCH was 22.5 (25.4 – 34.6); and his RDW was 19.5 (11 – 15). ECF No. 104-3 at 180.

On December 1, 2015 at 10:34 am, Plaintiff emailed "Ms. Grove" in Health Services, asking why he had not been seen in post-op follow up by anyone since his surgery. ECF No.

---

[47] Olsalazine is an anti-inflammatory drug used in the treatment of Inflammatory Bowel Disease and Ulcerative Colitis. It is a derivative of salicylic acid; inactive by itself (it is a prodrug), it is converted by the bacteria in the colon to mesalamine. Mesalamine works as an anti-inflammatory agent in treating inflammatory diseases of the intestines.  See Olsalazine, *available at:* < https://www.drugbank.ca/drugs/DB01250 >

[48] However, the BOP Health Services Medication Summary Historical indicates that the Mesalamine was not actually discontinued until October 30. 2015.  See ECF No. 104-3 at 153.

104-3 at 158. On December 3, 2015, he received a response, advising him that he had been seen by RN Hudnall for wound care on September 19, 2015; by Dr. Anderson on September 21st for a consultation; by RN Hall on September 28, 2015 for staple removal; that there were no signs of infection or drainage noted and the incision appeared healed, and that he had not returned to sick call nor requested any care via email since.  Id. He was advised to sign up for sick call if he had any problems. Id.

Plaintiff had blood drawn for a CBC on December 10, 2015. ECF No. 104-3 at 156. His H&H was 11.5/37.0 (13.5 – 18.0/40.0 – 52.0); his MCV was 71 (80 – 100); and the MCH was 22 (25.4 – 34.6). ECF No. 104-3 at 156.

On December 15, 2015, Dr. Anderson made an Administrative Note, documenting that Plaintiff's hemoglobin was "11.5, low MCV; improving, prior iron refusal" and that Plaintiff's labs had been reviewed. Id. at 7. Anderson's assessment was anemia and Crohn's. Id.

On December 29, 2015 at 11:30 am, Plaintiff emailed "Mrs. Wilson" in Health Services about "some problems with . . .[his] inside stitching," reporting that when he bent over to reach for something or tie his shoes, it felt like something was stabbing him by his navel. ECF No. 104-5 at 67. On December 30, 2015 at 9:25 am, PA Wilson responded, advising him that he was on that day's call out, and telling him to bring it up during the appointment. Id.

On December 30, 2015 at 1:20 pm, Plaintiff was seen in CCC by PA Alicia Wilson. ECF No. 104-3 at 2 – 6. Wilson noted that Plaintiff had "had surgery, 9/11, for UC. Had appendix removed along with 18 cm right colon and 13 cm of the ileum due to ulcerations, strictures." Id. at 2. She noted that he appeared well; was alert and oriented; and he reported some pain along the surgical incision line and intermittent constipation. Id. at 2 - 3. He was examined and his

prescriptions were renewed. Id. at 3 – 4. He was told to follow up at sick call as needed. Id. at 5. It was noted that he had a pending GI consult. Id. A CBC was ordered.  Id. at 5.

On January 13, 2016, Plaintiff had labs drawn. ECF No. 104-5 at 65.

On February 2, 2016, Plaintiff was transferred from FCI Gilmer[49] to FCI Butner.  See Anderson Decl., ECF No. 104-1, ¶ 88 at 12; see also January 29, 2016 BOP Health Services Inmate Intra-System Transfer (prepared by Joshua Hall, RN/IOP/IDC at FCI Gilmer). ECF No. 104-5 at 49- 53. Transfer date: February 2, 2016. Id. at 49. Transfer from: FCI Gilmer. Id. at 50. List of chronic health problems: gastritis – current; major depressive disorder – recurrent episode – remission; moderate generalized anxiety disorder – remission; regional enteritis of unspecified site (Crohn's) – current; asthma, unspecified – current.  Id. at 49. Temporary/acute health problems: dermatophytosis of foot (tinea pedis) – current; pulpitis – current; stiffness of joint – current; anemia, unspecified – current; nonadherence to medical treatment – current; dental caries extending into pulp – current; presbyopia – current; myopia – marked improvement . . . he is now extremely far sighted . . . hyperopia.[50] Id.

At FCI Butner, on February 29, 2016 at 11:25 am, Plaintiff was seen for an evaluation encounter by PA Pascale Lecuire in Health Services for a chief complaint of "gastrointestinal." The assessment of that encounter was: "45 y/o with treatment resistant Crohn's disease; chronic Crohn's previously managed for "years" poorly with mesalamine, had gastritis and mesalamine

---

[49] In addition to the medical visits related to his Crohn's disease noted supra, Plaintiff also saw FCI Gilmer medical, optometry, or dental staff for a variety of complaints on 37 separate occasions from April 8, 2014 until his transfer from FCI Gilmer on February 2, 2016. Because the information in those records is not necessary to the analysis of this case, they have not been summarized here.

Following his September 11, 2015 surgery, FCI Gilmer medical staff treated Plaintiff on 13 occasions from September 18, 2015 through February 2, 2016.

[50] The Federal Defendants also produced copies of Plaintiff's medical records continuing on through the end of November, 2016, after Plaintiff left FCI Gilmer, was in transit, and then was housed at FCI Butner Medium.  See ECF Nos. 104-4 and 104-5.  Because they are voluminous, and generally not necessary to the analysis of this case, while they have been reviewed, they are not specifically summarized here but instead, are referenced throughout the record where indicated.

was held, during this period developed exacerbation of Crohn's that resulted in a right hemicolectomy (18cm right colon and 13cm ileum removed due to ulcerations and strictures) and appendectomy in September 2015." ECF No. 104-4 at 56 (emphasis added).

On March 22, 2016, Plaintiff filed Administrative Tort Claim Number TRT- MXR-2016-03199. He claimed government liability in the amount of $25,000,000.00 for personal injury at FCI Gilmer. ECF No. 27 at 4. Specifically, he alleged BOP staff was deliberately indifferent to his serious medical needs, inflicted cruel and unusual punishment, committed malfeasance and possibly negligence in the treatment of his Crohn's disease, causing him needless extreme pain, weight loss, fear for his life, and subjecting him to surgery and removal of part of his intestine. Id. The BOP conducted an investigation into the claims and denied them on June 7, 2016, advising Plaintiff that he had six months from the date of the letter to file suit in the appropriate U.S. District Court. Plaintiff filed the present suit on September 27, 2016. Id. at 1 – 3.

### III. The Complaints

#### A. FTCA Action

#### 1) The Complaint [ECF No. 9]

Plaintiff's FTCA complaint ostensibly raises five claims that can be condensed into three:

1) Plaintiff alleges that for the six-month period beginning on approximately March 9, 2015, federal employees at FCI Gilmer were deliberately indifferent to his serious medical needs, when they deliberately failed to provide timely and correct diagnosis, testing, and treatment for his Crohn's disease, until on September 8, 2015, when he finally collapsed in "severe pain" and was taken to Stonewall Jackson Hospital, where a section of his colon was removed for "extreme blockage." ECF No. 9 at 9 – 11, 15.  He contends that the Defendant's employees' actions deprived him of basic human needs, violated his Fifth, Eighth, Eleventh, and Fourteenth Amendment rights to be free from cruel and unusual punishment.  Id. at 11 – 12, 15 - 16.

2) The Defendant's employees' actions in denying him proper and timely treatment for his Crohn's disease constituted medical negligence.  Id. at 12.

3) Defendant's employees' wrongful actions intentionally inflicted emotional distress upon Plaintiff.  Id. at 13.

Plaintiff contends that he filed an administrative tort claim with the BOP on March 22, 2016, and received a written acknowledgment on March 29, 2016, identifying his claims as TRT-MXR-2016-03199.  Id. at 14. Plaintiff received a June 7, 2016 final denial letter on his claim. ECF No. 27.

Plaintiff contends that as a result of the Defendant's employee's wrongful actions, he has suffered needless extreme pain and lost part of his colon.  Id. at 19.

As relief, Plaintiff seeks damages against the defendants in their individual and official capacity; specifically, he requests $25,000,000.00 in actual damages; $25,000,000.00 in compensatory damages; $25,000,000.00 in punitive damages from the "[d]efendants jointly and severly [sic];" pre- and post-judgment interest, and attorney fees. Id.

**2)  The United States' Motion to Dismiss [ECF No. 36]**

The United States argues that the FTCA complaint should be dismissed because:

a) Plaintiff's claim for medical negligence should be dismissed because Plaintiff failed to comply with the West Virginia Medical Professional Liability Act ("MPLA") by filing a pre-suit screening certificate of merit; and

b) Plaintiff failed to exhaust his administrative remedies for his claim of intentional infliction of emotional distress, thus he is precluded from raising it here.

ECF No.  37 at 2 – 5.

**3)  Plaintiff's Response in Opposition to the United States' Motion to Dismiss [ECF No. 80]**

Plaintiff's untimely response in opposition reiterates his claims and attempts to refute the United States' on the same.  More specifically, he argues that W.Va. Code § 55-7-B-1 *et seq.* is unconstitutional as applied to him, because as a federal prisoner, he does not have access to state law in a BOP facility. ECF No. 80 at 3.  Therefore, he contends, he is being denied meaningful

access to the courts. Id. at 3 – 4.  Further, he argues, pursuant to McKinley v. United States,[51]

West Virginia's MPLA is an additional requirement that imposes a heightened pleading

requirement beyond that set forth in Fed.R.Civ.P. 8(a). Id. at 4.  He argues that he had no idea

that a screening certificate of merit was required, and avers that without the appointed counsel he

has repeatedly requested, there is no way he can "have an expert witness prepare a[] certificate of

merit."  Id.

Further, he denies the United States' contention that he did not include a claim of

emotional distress at the Administrative Tort stage, and argues that because he is untrained in the

law, he did not know the proper way to word the claim, but believes he set it forth sufficiently

for it to be understood.  Id. at 5.

## B. Bivens Action

## 1) The Complaint [ECF No. 17]

Plaintiff's Bivens complaint also raises five claims that can be condensed into three:

1) Plaintiff alleges that for the six-month period beginning on approximately March 9, 2015, federal employees at FCI Gilmer were deliberately indifferent to his serious medical needs, when they deliberately failed to provide timely and correct diagnosis, testing, and treatment for his Crohn's disease, until on September 8, 2015, when he finally collapsed in "severe pain" and was taken to Stonewall Jackson Hospital, where a section of his colon was removed for "extreme blockage." ECF No. 17 at 17, 20 – 22.  He contends that the Defendant's employees' actions deprived him of basic human needs, violated his Fifth, Eighth, Eleventh, and Fourteenth Amendment rights to be free from cruel and unusual punishment.  Id. at 18, 22 – 23.

2) The Defendant's employees' actions in denying him proper and timely treatment for his Crohn's disease constituted medical negligence.  Id. at 23.

3) Defendant's employees' wrongful actions intentionally inflicted emotional distress upon Plaintiff.  Id. at 19.

---

[51] McKinley v. United States, 2015 U.S. Dist. LEXIS 135893. * 26 - * 27, 2015 WL 5842626 (M.D. Ga. Oct. 6, 2015).

Plaintiff contends that he exhausted his administrative remedies with regards to his claims and attaches copies of his grievances. Id. at 4, 7 – 15.

Plaintiff contends that as a result of the Defendant's employee's wrongful actions, he has suffered needless extreme pain and lost a portion of his colon. Id. at 19.

As relief, Plaintiff seeks damages against the defendants in their individual and official capacity; specifically, he requests $25,000,000.00 in actual damages; $25,000,000.00 in compensatory damages; $25,000,000.00 in punitive damages from the "[d]efendants jointly and severly [sic];" pre- and post-judgment interest, and attorney fees. Id.

## 2) St. Joseph Hospital's first Motion to Dismiss [ECF No. 53]

Defendant SJH argues that the complaint should be dismissed for failure to state a claim upon which relief can be granted because:

a) Plaintiff's FTCA complaint[52] fails to state a cause of action against SJH upon which relief can be granted, because Plaintiff did not comply with the mandatory pre-suit notice requirements of the West Virginia MPLA by filing a screening certificate of merit before filing a medical negligence claim against SJH;

b) Plaintiff's complaint should be dismissed as to SJH due to insufficient service of process;

c) Plaintiff's medical negligence claims against SJH are time-barred.

ECF No. 53-1 at 3 – 8.

## 4) St. Joseph's Hospital's second Motion to Dismiss [ECF No. 141]

Defendant SJH argues that the complaint should be dismissed for failure to state a claim upon which relief can be granted because:

---

[52] Defendant SJH states that the January 5, 2018 Order to Answer "directed [the] US Marshals to serve SJH with a Summons and a copy of Plaintiff's FTCA complaint [ECF 46]." See ECF No. 53-1, ¶ 5 at 2.

However, a review of that January 5, 2018 Order to Answer clearly says that a copy of the "Bivens complaint [ECF No. 17]" was to be served on the Bivens defendants. See ECF No. 46 at 3. The FTCA complaint is ECF No. 9. As noted supra, inexplicably, despite this clear directive, while the other Bivens defendants all received copies of the Bivens complaint, the Clerk apparently sent a copy of the FTCA complaint to Defendant SJH.

a) Plaintiff's <u>Bivens</u> complaint fails to state a cause of action against SJH upon which relief can be granted, because Plaintiff did not comply with the mandatory pre-suit notice requirements of the West Virginia MPLA by filing a screening certificate of merit before filing a medical negligence claim against SJH; and

b) SJH is not an appropriate <u>Bivens</u> defendant, because <u>Bivens</u> liability does not extend to persons or entities that are not federal agents; SJH is not a federal agent; rather, it is a private hospital to which incarcerated individuals are sometimes brought for treatment.

ECF No. 141 at 4 – 7.

## 5) <u>Plaintiff's Response in Opposition to St. Joseph's Hospital's second Motion to Dismiss [ECF No. 150]</u>

Plaintiff reiterates his claims and arguments against SJH and attempts to refute SJH's arguments on the same. He contends that despite SJH's argument to the contrary, he is not raising a medical negligence claim against SJH, which would require a screening certificate of merit, but rather, a claim of deliberate indifference to serious medical needs, and thus, the MPLA does not apply to him. ECF No. 150 at 2 – 3.  Alternatively, he argues that the MPLA's requirement of a screening certificate of merit imposes a heightened pleading standard which conflicts with Rule 8(a) of the Federal Rules of Civil Procedure, which only requires a short and plain statement of the claim, showing that the pleader is entitled to relief. <u>Id.</u> at 4. Further, he argues, inmates have no access to medical professionals, let alone money to pay them to obtain such medical opinions/screening certificates, and thus, without an attorney, it is impossible for an inmate to comply with the MPLA requirements. <u>Id.</u> Therefore, he argues, the MPLA is unconstitutional as it applies to him, because as a federal prisoner, it effectively denies him access to the courts.  <u>Id.</u> Further, he asserts that as a federal prisoner, he has no access to state statutes or case law, placing him at an even greater disadvantage and further depriving him of his right of access to the courts. <u>Id.</u> He cites to <u>Sumpter v. United States</u>[53] for the proposition that the

---

[53] <u>Sumpter v. United States</u>, 2018 U.S. Dist. LEXIS 79141 * 16 - * 17; 2018 WL 2170505 (S.D. W.Va. May 10, 2018).

requirement of pre-suit notice is not intended to deny or restrict citizens' access to the courts, but intended to prevent frivolous medical malpractice lawsuits. Id. at 5.  Finally, he argues that SJH is a proper party in a <u>Bivens</u> action, because it performed health services tasks for FCI Gilmer, fulfilling the BOP's obligation to provide medical care, and therefore, it functioned as a federal actor under color of federal law. Id. at 6 – 8.

### 3) **Individual Federal Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment [ECF Nos. 103, 104]**

The Federal Defendants argue that the <u>Bivens</u> complaint should be dismissed or summary judgment granted in their favor because:

a) Defendants Lynch, Samuels, and Caraway are non-residents of West Virginia, thus, there is no personal jurisdiction over them and they should be dismissed from this action;

b) Defendants Rebecca Grove and Joshua Hall are United States Public Health Service Employees; thus, they are entitled to absolute immunity;

c) there is insufficient personal involvement to support <u>Bivens</u> liability against Defendants Lynch, Samuels, Caraway, Weaver, or Grove;

d) Plaintiff cannot establish an Eighth Amendment violation against Defendants Anderson, Andrea Hall, Alicia Wilson, or any other federal defendant, because while Plaintiff's Crohn's Disease is an objectively sufficiently serious medical need, he cannot show that it was not timely or properly treated, nor can Plaintiff prove that any defendant had a culpable state of mind to fulfil the subjective component of deliberate indifference; and

e) all of the Federal Defendants are entitled to qualified immunity.

ECF No. 104 at 21 - 31.

### 4) **Plaintiff's Response in Opposition to the Individual Federal Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment [ECF No. 137]**

Plaintiff objects to the Individual Federal Defendants' having included medical records back to early 2014, including dental, optometry, and mental health records to its response, asserting that it is an "attempt to cloud the issues." ECF No. 137 at 1. He also objects to the undersigned's perceived bias by failing to grant him the longer extension of time he requested, to

respond to the Individual Federal Defendants' dispositive motion, because the case is complicated with extensive medical records to review; and to the undersigned's repeated denial of his requests for appointed counsel.  Finally, he asserts the need for an expert witness to review the medical records for further evidence of deliberate indifference. See generally, ECF No. 137 at 1 – 2.

He lists numerous dates and instances from the medical records where his Crohn's Disease symptoms were reported, not given due attention, minimized, and/or treatment or diagnostic testing was postponed. Id. at 3 – 5. He explains that he initially refused the colonoscopy on December 10, 2014, only because he was told he would be placed in the SHU to wait for an unknown number of days, and thought that he was being punished.  Id. at 3. Regarding the Individual Federal Defendants' contention that he was noncompliant with his diet because he purchased inappropriate foods from the commissary, he avers that when Dr. Anderson brought up the issue during his August 21, 2015 visit, he explained that he "did not eat the items purchased but instead used them to purchase food items he could eat." Id. at 4.

Plaintiff then reiterates his arguments and attempts to refute the Individual Federal Defendants' arguments on the same.  More specifically, he challenges the Individual Federal Defendants' argument regarding the lack of personal jurisdiction over Defendants Lynch, Samuels, and Caraway. Id. at 6. He asserts that Defendants Grove and J. Hall are not entitled to absolute immunity as commissioned officers in the United States Public Health Service, because he also included all of the Bivens defendants in his FTCA complaint. Id. at 8. He challenges the Individual Federal Defendants' conclusion that there is insufficient personal involvement to support Bivens liability against Defendants Lynch, Samuels, Caraway, Weaver, or Grove. Id. at 9. He argues that he can demonstrate Eighth Amendment violations on the parts of Defendants

Anderson, A. Hall, A. Wilson, and the other defendants. Id. at 10.  He argues that the Defendants were all aware of his symptoms but refused to prioritize the diagnostic testing that might have provided answers and some relief; he points to the August 14, 2015 visit where the mass or "knot" in his abdomen was noted by Nurse Hudnall, and the note of that visit co-signed by Dr. Anderson and reviewed by Wilson; the August 21, 2015 to Nurse J. Hall, who wrote "no mass(es) in his report, which was cosigned by" Anderson; and his August 26 and 28, 2015 visits where he reported the "knot" in his abdomen, and that note was co-signed both times by Wilson. Id. at 11.  He objects to the Federal Defendants' characterization of his statements as "by Plaintiff's own admission," he received constant care; Plaintiff admits that he was seen by FCI Gilmer Health Services personnel, but argues that he did not receive proper or timely care; instead, he contends, whenever he presented, he was just seen, told to "drink lots of water and . . . return to [his] housing unit." Id. at 12.  He notes that while the Individual Federal Defendants report that he received numerous exams, consults, lab work, a CT scan, colonoscopy, and ultimately, a laparotomy, they omit mention of the fact that the CT scan, colonoscopy, and laparotomy were only provided after he finally collapsed in agony and was rushed to the hospital. Id. at 12 – 13. He lists instances he believes show subjective awareness on the part of Individual Federal Defendants (including several former defendants who have already been dismissed from this action). Id. at 13 – 16. He challenges the remaining Individual Federal Defendants' contention that they are entitled to qualified immunity. Id. at 16 – 17.

## IV.  Standard of Review

### A. Motion to Dismiss

In ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded material factual allegations.   Advanced Health-Care Services, Inc., v. Radford

Community Hosp., 910 F.2d 139, 143 (4th Cir. 1990). Moreover, dismissal for failure to state a claim is properly granted where, assuming the facts alleged in the complaint to be true, and construing the allegations in the light most favorable to the plaintiff, it is clear as a matter of law that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint. Conley v. Gibson, 355 U.S. 41, 45 - 46 (1957).

When a motion to dismiss pursuant to Rule 12(b)(6) is accompanied by affidavits, exhibits and other documents to be considered by the Court, the motion will be construed as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

### B.  Motion for Summary Judgment

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that the "party opposing a properly supported motion for summary

46

judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment. Id. at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, at 587 (citation omitted).

Plaintiff is proceeding *pro se* and therefore, the Court is required to liberally construe his pleadings. Estelle v. Gamble, 429 U.S. 97 (1976); Haines v. Kerner, 404 U.S. 519 (1972) (*per curiam*); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978); Gordon v. Leake, 574 Fed 2nd 1147 (4th Cir. 1978). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Haines, 404 U.S. at 520 – 21.

The mandated liberal construction means only that of the court can reasonably read the pleadings to state a valid claim on which Plaintiff could prevail, it should do so. Barnett v. Hargett, 174 Fed 3rd 1128 (10th Cir. 1999). However, a court may not construct plaintiff's legal arguments for him. Small v. Endicott, 998 F.2d 411 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." Beaudett v. City of Hampton, 775 F.2d 1274 (4th Cir. 1985).

## IV. Analysis

### A. FTCA Tort Complaint

The FTCA is a comprehensive legislative scheme by which the United States has waived its sovereign immunity to allow civil suits for actions arising out of the negligent acts of agents of the United States. The United States cannot be sued in a tort action unless it is clear that

Congress has waived the government's sovereign immunity and authorized suit under the FTCA. Dalehite v. United States, 346 U.S. 15, 30-31 (1953).

The provision of the FTCA are found in Title 28 of the United States Code. 28 U.S.C. §§ 1346(b), 1402(b), 2401(b) and 2671-2680.

The Supreme Court has held that "a person can sue under the Federal Tort Claims Act to recover damages from the United States Government for personal injuries sustained during confinement in a federal prison, by reason of the negligence of a government employee." United States v. Muniz, 374 U.S. 150 (1963). However, the FTCA does not create a new cause of action. Edina v. United States, 259 F.3d 220, 223 (4th Cir. 2001). "The statute permits the United States to be held liable in tort in the same respect as a private person would be liable under the law of the place where the act occurred." Id.

However, there is no prejudgment interest and no punitive damages awarded in a FTCA action.  See 28 U.S.C. § 2674, which provides as follows:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, **but shall not be liable for interest prior to judgment or for punitive damages.**

28 U.S.C. § 2674 (emphasis added).

## A. Medical Negligence Claim

To establish a medical negligence claim in West Virginia, the plaintiff must prove:

> (a) the health care provider failed to exercise that degree of care, skill, and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and (b) such failure was a proximate cause of the injury or death.

W.Va. Code § 55-7B-3.

When a medical negligence claim involves an assessment of whether or not the plaintiff was properly diagnosed and treated and/or whether the health care provider was the proximate cause of the plaintiff's injuries, expert testimony is required.   Banfi v. American Hospital for Rehabilitation, 529 S.E.2d 600, 605-606 (W.Va. 2000).

Additionally, under West Virginia law, certain requirements generally must be met before a health care provider may be sued. W.Va. Code §55-7B-6.  This  section provides in pertinent part:

> **§ 55-7B-6. Prerequisites for filing an action against a health care provider; procedures; sanctions**
>
> (a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without complying      with      the      provisions      of      this      section.
>
> At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit. The screening certificate of merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: The expert's familiarity with the applicable standard of care at issue; the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert witness in any judicial proceeding. Nothing in this subsection may be construed to limit the application of rule 15 of the rules of civil procedure.

This Court previously held that compliance with W.Va.  Code § 55-7B-6 is mandatory prior to filing suit in federal court.  See Stanley v. United States,  321 F.Supp.2d 805, 806-807 (N.D. W.Va. 2004).

Plaintiff's complaint alleges that federal employees at FCI Gilmer acted with medical negligence in failing to provide timely medical testing and treatment. ECF No. 9 at 9 – 11, 15. Specifically, Plaintiff alleges that Defendant's employees failed to provide tests and studies timely for specialist treatment over an unreasonable time period.  Id.  He asserts that the delay in treatment caused is chronic conditions to worsen. Id.

In its Motion to Dismiss, the United States contends that Plaintiff's claim should be dismissed because he failed properly file a screening certificate of merit pursuant to the MPLA. ECF No. 37 at 3 – 5. Further, the United States argues, the diagnosis and treatment of Plaintiff's condition requires a medical expert, because the issues are not within the common knowledge or experience of a lay person.  Id. at 4.

In response, Plaintiff argues that MPLA is unconstitutional as it applies to him, because as a federal prisoner, he has no access to state statutes or case law, placing him at such a disadvantage, it effectively denies him meaningful access to the courts. ECF No. 80 at 3 – 4. Further, he argues, under McKinley, 2015 U.S. Dist. LEXIS 135893 at * 26 - *27, the MPLA imposes a heightened pleading standard on him, which conflicts with Rule 8(a) of the Federal Rules of Civil Procedure. Id. at 4. He contends that without appointed counsel, he is unable to have an expert prepare a screening certificate of merit.[54] Id. at 4 - 5.

Plaintiff's claim that McKinley conflicts with Rule 8(a) of the Fed.R.Civ.P. is noted; unfortunately, however, McKinley is not controlling law in this jurisdiction.

Here, as noted *supra*, it appears that from June 18, 2014 until approximately February 2, 2016, the medical staff at FCI Gilmer evaluated and provided treatment for Plaintiff's Crohn's disease. Plaintiff alleges that for the six-month period beginning approximately March 9, 2015,

---

[54] Despite having been granted an extension of time to obtain a screening certificate of merit [ECF No. 44], Plaintiff has not provided one.

and continuing until September 8, 2015, the FCI Gilmer medical staff failed to timely provide a correct diagnosis, and failed to provide testing and treatment for his Crohn's. ECF No. 9 at 9 -11, 15. After Plaintiff finally collapsed in severe pain on September 8, 2015, he was taken to an outside hospital (SJMH), where, on September 11, 2015, a section of his bowel was removed for "extreme blockage." ECF No. 9 at 9 – 11, 15. Plaintiff contends that FCI Gilmer's medical staff's untimely and inadequate medical treatment caused him needless, extreme pain, the loss of part of his bowel, and emotional distress. Id. at 19.

The undersigned agrees with the United States that Plaintiff's Crohn's disease is a complex medical issue which requires that a screening certificate of merit be filed.   In Johnson v. United States, 394 F.Supp.2d 854, 858 (S.D. W.Va. 2005), the Court held that plaintiff's statement on his administrative claim form alleging improper surgical implantation of a prosthesis satisfied the provisions of the MPLA permitting the filing of a claim without submitting a certificate of merit. Id. The Court reasoned that plaintiff's claim was based upon a well-established legal theory of liability and expert testimony was not required to show a breach of the standard of care because plaintiff stated on his form that the surgeon "implanted the too large Prosthesis backward causing diminished bloodflow and subsequent Necrosis and infection." Id. at 858 (all spelling and punctuation errors in original).[55]

Unlike the facts in Johnson, Plaintiff's allegations of medical negligence are complex and expert testimony is necessary. See O'Neil v. United States, 2008 WL 906470 (S.D. W.Va. Mar. 31, 2008)(finding that plaintiff was not excused from filing a screening certificate of merit

---

[55] Johnson is a rare exception to "the general rule that in medical practice cases negligence or want of professional skill can be proved only by expert witnesses." See Banfi v. Am. Hosp. for Rehab., 529 S.E.2d 600, 605 (W.Va. 2000). A court shall require expert testimony except where the "lack of care or want of skill is so gross, so as to be apparent, or the alleged breach relates to noncomplex matters of diagnosis and treatment within the understanding of lay jurors by resort to common knowledge and experience…" Id. at 605-606.

because the treatment and diagnosis of Graves disease, hyperthyroidism, congestive heart failure, and cardiomyopathy, are not within the understanding of lay jurors by resort to common knowledge and experience); see also Lancaster v. Hazelton, 2018 U.S. App. LEXIS 20836, *1 (4th Cir. Jul. 26, 2018) (*per curiam*) (affirming this court's dismissal of his FTCA medical negligence claims for his failure to file the required screening certificate of merit, pursuant to W. Va. Code § 55-7B-6(b) prior to filing his medical negligence claim).

Expert testimony is necessary to support any finding that the medical treatment provided by the staff at FCI Gilmer fell below the applicable standard of care. The undersigned finds that the symptoms, methods of prevention, and proper treatment options for Crohn's disease are not within the understanding of lay jurors by resort to common knowledge and experience. Further, neither is the alleged causal connection in the delay of the testing and the injuries alleged. Accordingly, Plaintiff is not excused from filing a screening certificate of merit pursuant to West Virginia Code § 55–7B–6(c) and his FTCA medical negligence claim against the United States' employees should be dismissed.

## B. Tort of Outrage/Intentional Infliction of Emotional Distress

In order to prove the tort of outrage, the West Virginia Supreme Court has held:

In order for a plaintiff to prevail on a claim for intentional or reckless infliction of emotional distress, four elements must be established. It must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Travis v. Alcon Laboratories, Inc., 504 S.E.2d 419, Syl. Pt. 3 (W.Va. 1998).

The United States argues that Plaintiff's claim of intentional infliction of emotional distress ("IIED") was not exhausted at the administrative stage, because Plaintiff only alleged medical negligence, and that the untimely and improper medical treatment caused him to suffer extreme pain and "mental and emotional distress from the fear of possible death at the total indifference to [his] pain and suffering."  ECF No. 37 at 5. The United States asserts that because Plaintiff did not allege an actual cause of action for IIED, he is precluded from raising it now. Id. Moreover, it contends, to the extent that Plaintiff's claim of emotional distress is merely a claim for pain and suffering from the alleged medical negligence, the claims should fail, because Plaintiff did not file the necessary screening certificate of merit. Id.

In response, Plaintiff contends that he believes that his IIED claim was sufficiently stated in his administrative tort claim. ECF No. 80 at 5. He again argues that the Defendant is trying to hold him to a "high standard of pleading" and that his access to the courts is being illegally impeded by a state statute.  Id. at 3 - 4.

Here, affording the *pro se* Plaintiff the benefit of liberal construction of his pleadings as required, the undersigned finds that Plaintiff sufficiently stated his IIED claim in his administrative tort claim and in his pleadings here, and that dismissal of this claim would be inappropriate, under the circumstances.  It is apparent from a thorough review of the record that while the Defendant's employees *did* provide Plaintiff with *some* medical care when he repeatedly presented at Health Services, begging for help and outside referrals, and that they provided *some* diagnostic testing and medication, and did refer Plaintiff for an endoscopy/colonoscopy, after that, despite Plaintiff's continued and obvious decline and increasing pain, the Defendant's employees completely ignored the outside provider's advice to "re-check the patient as needed" within four weeks to assess Plaintiff's condition after a 4-week

trial off of his Crohn's medicine. Instead, when Plaintiff repeatedly returned to Health Services seeking relief for his acute discomfort, inability to eat any solid food, marked weight loss, signs of progressive blood loss anemia, increased pain when he merely moved around, and finally, the development of peritoneal signs, Defendant's employees merely provided empty promises and useless advice, such as "drink more water," "rest," "come back if it gets worse." Meanwhile, Plaintiff's bowel was eroding,[56] ulcerating, and becoming so swollen inside that his colon was gradually becoming completely obstructed. How Health Services staff could ignore such obvious signs that urgent surgical evaluation and treatment, instead of water and rest was required, it is difficult to imagine.  While it is true that *eventually*, the Defendant's employees did transfer him to an outside hospital, where he received emergency treatment, surgery, and post-operative care, it was not until Plaintiff collapsed in agony on September 8, 2015, that they finally did so.

The undersigned finds that Defendant's employees' conduct was atrocious, intolerable, and so extreme and outrageous that it exceeded the bounds of decency. While the Defendant's employees may not have acted with the actual *intent* to inflict emotional distress, the undersigned finds that they acted recklessly when it was certain or substantially certain emotional distress would result from their conduct, and that their actions caused the Plaintiff to experience emotional distress so severe that no reasonable person could be expected to endure it.  The pain, frustration, desperation and apprehension Plaintiff suffered had to be excruciating; yet there is no evidence in the record of any attempt on Defendant's employees to provide much relief. Likewise, there is no evidence in the record of drug-seeking behavior on Plaintiff's part, to account for FCI Gilmer's Health Services staff's dismissive attitude toward him, given that his only requests were for outside diagnostic testing and providers. Nonetheless, Defendant's

---

[56] As noted *supra*, it is unclear from the limited hospital records provided whether Plaintiff's abscessed bowel actually perforated before the surgery was performed.

employees' notes often seemed to imply that Plaintiff was malingering or exaggerating; Plaintiff would report pain level of 8 or 10 on a scale of 1 – 10, and FCI Gilmer Health Services staff would document this, but then simultaneously and inexplicably report that Plaintiff was in "no acute distress." At times, when he presented, complaining of severe abdominal pain, his abdomen was not even examined.  As noted *supra*, at one point, when yet another empty promise was made to remind Plaintiff that he had pending outside appointments for diagnostic testing, Plaintiff responded "*I'll be dead before the tests are done*."   ECF No. 104-3 at 38 – 43.  Moreover, a careful review of the record indicates that on at least two instances, Defendant's employees indicated to Plaintiff that they would try to expedite his appointments with outside providers [ECF No. 104-3 at 199; ECF No. 104-3 at 50] but there is no indication in the records that any attempt to actually do so was ever made.

Accordingly, the undersigned finds that the facts of this case meet the standards for the tort of outrage and the undersigned recommends that Plaintiff's claim for IIED against the United States survive the United States' motion to dismiss.

## B. Bivens Complaint

In general, the Eighth Amendment prohibits "cruel and unusual punishment." Farmer v. Brennan, 511 U.S. 825 (1994).   In order to comply with the Eighth Amendment, prison punishment must comport with "the evolving standards of decency that mark the progress of a maturing society." Estelle v. Gamble, 429 U.S. 97, 102 (1976). "A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. at 837.

To demonstrate that a prison official violated the Eighth Amendment by denying medical care, an inmate must show (1) that the deprivation alleged was objectively "sufficiently serious" and (2) that the prison official was "deliberately indifferent" to the inmate's health or safety. Farmer v. Brennan, 511 U.S. 825, 834 (1994). With respect to the first element, a medical condition is sufficiently serious if it is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014); see also Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990), cert. denied, 500 U.S. 956 (1991). A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent loss. Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987), cert. denied, 486 U.S. 1006 (1988).[57]

---

[57] The following are examples of what does or does not constitute a serious injury. A rotator cuff injury is not a serious medical condition. Webb v. Prison Health Services, 1997 WL 298403 (D. Kansas 1997). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. Veloz v. New York, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. Brice v. Virginia Beach Correctional Center, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. Browning v. Snead, 886 F. Supp. 547 (S.D. W.Va. 1995). And, arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities. Finley v. Trent, 955 F. Supp. 642 (N.D. W.Va. 1997). A pituitary tumor is a serious medical condition. Johnson v. Quinones, 145 F.3d 164 (4th Cir. 1998). A plate attached to the ankle, causing excruciating pain and difficulty walking and requiring surgery to correct it is a serious medical condition. Clinkscales v. Pamlico Correctional Facility Med. Dep't., 2000 U.S. App. LEXIS 29565 (4th Cir. 2000). A tooth cavity can be a serious medical condition, not because cavities are always painful or otherwise dangerous, but because a cavity that is not treated will probably become so. Harrison v. Barkley, 219 F.3d 132, 137 (2nd Cir. 2000). A prisoner's unresolved dental condition, which caused him great pain, difficulty in eating, and deterioration of the health of his other teeth, was held to be sufficiently serious to meet the Estelle standard. Chance v. Armstrong, 143 F.3d 698, 702 - 703 (2nd Cir. 1998). A degenerative hip condition that caused a prisoner "great pain over an extended period of time and . . . difficulty walking" is a serious condition. Hathaway v. Coughlin, 37 F.3d 63, 67 (2nd Cir. 1994). Under the proper circumstances, a ventral hernia might be recognized as serious. Webb v. Hamidullah, 281 Fed. Appx. 159 (4th Cir. 2008). A twenty-two hour delay in providing treatment for inmate's broken arm was a serious medical need. Loe v. Armistead, 582 F.2d 1291, 1296 (4th Cir. 1978). A ten-month delay in providing prescribed medical shoes to treat severe and degenerative foot pain causing difficulty walking is a serious medical need. Giambalvo v. Sommer, 2012 WL 4471532 at *5 (S.D.N.Y. Sep. 19, 2012). Numerous courts have found objectively serious injury in cases involving injury to the hand, including broken bones. See, e.g., Lepper v. Nguyen, 368 F. App'x. 35, 39 (11th Cir. 2010); Andrews v. Hanks, 50 Fed. Appx. 766, 769 (7th Cir. 2002);

As to the second element, a prison official cannot be found to be deliberately indifferent to an inmate's health or safety unless the official knows of and disregards an excessive risk to inmate health or safety.   Farmer, 511 U.S. at 837. This standard is a higher standard for culpability than mere negligence or even civil recklessness, and because of this, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference.  Jackson, 775 F.3d at 178. If a prison official does have knowledge of a substantial risk to inmate health or safety, he or she may still be free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. Farmer, 511 U.S. at 844.  On the other hand, a doctor's failure to provide care that he himself deems necessary to  treat   an inmate's serious medical   condition may constitute  deliberate indifference.  Jackson, 775 F.3d at 179 (citing Miltier v. Boern, 896 F.2d 848, 853 (4th Cir. 1990) (overruled on other grounds)).

## 1) **Defendant St. Joseph Hospital**[58]

Plaintiff's complaint impliedly alleges that SJH, was negligent and/or deliberately indifferent to his serious medical needs, because a May 19, 2015 endoscopy and colonoscopy performed by Dr. Salavatore Lanasa misdiagnosed his condition and incorrectly concluded that Plaintiff did not have Crohn's disease, leading to further delay in him receiving proper treatment and continuing his pain and suffering. ECF No. 17 at 20.

---

Bryan v. Endell, 141 F.3d 1290, 1291 (8th Cir. 1998) Beaman v. Unger, 838 F.Supp. 2d 108, 110 (W.D. N.Y. 2011); Thompson v. Shutt, 2010 WL 4366107 at *4 (E.D. Cal. Oct. 27, 2010); Mantigal v. Cate, 2010 WL 3365735 at *6 (C.D. Cal. May 24, 2010) *report and recommendation adopted,* 2010 WL 3365383 (C.D. Cal. Aug. 24, 2010); Johnson v. Adams, 2010 WL 1407787 at *4 (E.D. Ark. Mar. 8, 2010) report and recommendation adopted, 2010 WL 1407790 (E.D. Ark. Mar. 31, 2010); Bragg v. Tyler, 2007 WL 2915098 at *5 (D.N.J. Oct. 4, 2007); Vining v. Department of Correction, 2013 U.S. Dist. LEXIS 136195 at *13 (S.D.N.Y. 2013)(chronic pain arising from serious hand injuries satisfies the objective prong of Eighth Amendment deliberate indifference analysis). A three-day delay in providing medical treatment for an inmate's broken hand was a serious medical need. Cokely v. Townley, 1991 U.S. App. LEXIS 1931 (4th Cir. 1991).

[58] Only Defendant SJH's argument contained in its second Motion to Dismiss, addressing the Bivens complaint, will be considered here; its first Motion to Dismiss the FTCA complaint inadvertently served on it by clerical error, will be denied as moot at the end of this R&R.

Defendant SJH contends, *inter alia*, that as a private hospital, it is not a proper defendant for a Bivens action.  In his response in opposition, *inter alia*, after first clarifying that he is raising a claim of deliberate indifference to serious medical needs, not a medical negligence claim against SJH [ECF No. 150 at 2 - 3], Plaintiff nonetheless provides an extended medical negligence argument regarding the MPLA and its requirements [id. at 2 - 5], argument which is inapplicable here. However, Plaintiff also argues that SJH is a proper party in a Bivens action because SJH was "acting as a federal actor to fulfill [the] BOP's obligation." Id. at 2, 6 – 8.

Nonetheless, the undersigned agrees with SJH that a hospital is not a proper defendant for a Bivens action. At the time that Plaintiff underwent his May 19, 2015 endoscopy and colonoscopy, SJH was a private entity, a hospital run by the Pallottine Missionary Sisters; subsequently, on October 6, 2015, it merged with United Hospital Center ("UHC") and WVU Medicine.[59] A Bivens cause of action is only available against federal officers in their individual capacities, and not the federal agency which employs the persons acting under federal law.  See FDIC v. Meyer, 510 U.S. 471, 484-86 (1994) (refusing to find a Bivens remedy against a federal agency); see also Randall v. United States, 95 F.3d 339, 345 (4th Cir. 1996) ("Any remedy under Bivens is  against  federal  officials individually, not the federal government."); Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 122 S. Ct. 515, 517, 151 L. Ed. 2d 456 (2001)(A Bivens action may only brought against the federal officer, not the officer's employer, the United States, the Bureau of Prisons, or a federal agency, even though the agency may be otherwise amenable to suit).  Moreover, even if Dr. Lanasa had not already been dismissed from this action, he would not be a proper Bivens defendant, either. While it is unclear from the record whether Lanasa was an independent contractor or merely an employee of SJH on May 19, 2015;

---

[59] See St. Joseph Hospital of Buckhannon Becomes Part of West Virginia United Health System Network, *available at*: https://www.wboy.com/archives/st-joseph-s-hospital-of-buckhannon-becomes-part-of-wv-united-health-system-network/864508354 >

physicians contracted to treat inmates cannot be <u>Bivens</u> defendants, either. <u>See</u> <u>O'Neil v.</u> <u>Anderson</u>, 372 Fed. Appx. 400, 401, 2010 U.S. App. LEXIS 6428, *1 (2010) (declining to extend a <u>Bivens</u> remedy against a doctor who was an independent contractor because of the availability of a state court remedy for medical negligence).

Accordingly, Defendant SJH should be dismissed from this <u>Bivens</u> action.

## 2) **<u>Defendants Loretta Lynch, Charles Samuels, Jr., J.F. Caraway, and Mr. Weaver</u>**

Liability in a <u>Bivens</u> case is "personal, based upon each defendant's own constitutional violations." <u>Trulock v. Freeh</u>, 275 F.3d 391, 402 (4th Cir.2001) (internal citation omitted). Therefore, in order to establish liability in a <u>Bivens</u> case, the plaintiff must specify the acts taken by each defendant which violate his constitutional rights. <u>See</u> <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2nd Cir. 1994); <u>Colburn v. Upper Darby Township</u>, 838 F.2d 663, 666 (3rd Cir. 1988). Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown. <u>See</u> <u>Zatler v. Wainwright</u>, 802 F.2d 397, 401 (11th Cir. 1986). *Respondeat superior* cannot form the basis of a claim for a violation of a constitutional right in a <u>Bivens</u> case. <u>Rizzo v. Good</u>, 423 U.S. 362 (1976). Because vicarious liability is inapplicable to <u>Bivens</u> and Section 1983 suits, a plaintiff must plead that each government-official, through the official's own individual actions, has violated the Constitution. <u>Ashcraft v. Iqbal</u>, 556 U.S. 662 (2009). "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own conduct." <u>Id.</u> at 1948-49.

With respect to Loretta Lynch, the former Attorney General of the United States; the former BOP Director Charles E. Samuels; BOP Mid-Atlantic Regional Director J.F. Caraway; and Mr. Weaver, FCI Gilmer Health Service Administrator, Plaintiff's complaint asserts no personal involvement on the part of any of these defendants in the alleged violations of his

constitutional rights. Instead, Plaintiff merely lists them as parties to the <u>Bivens</u> action, asserting that they acted in or were clothed with the authority of federal law. ECF No. 17 at 2 – 3. Plaintiff's response in opposition to the Individual Federal Defendants' dispositive motion alleges that Lynch, as the (former) Attorney General, is vested with oversight of "all functions of other officers of the Department of Justice and . . . agencies and employees of the Department of Justice." <u>Id.</u> at 6. He also alleges that he presented grievances and/or letters regarding his concerns about his medical care to Samuels and Caraway. ECF No. 137 at 6 – 7, 9. He alleges that he communicated via electronic messaging with Weaver about issues with his medical care but was ignored or no action was taken; he references Exhibits 3, 4, and 5, attached to his response. However, Exhibits 3, 4, and 5 do not reflect that the electronic messages went to Weaver; the response from the Health Services personnel who responded in Exhibit 3 is unsigned [ECF No. 137-3]; the electronic messages attached as Exhibits 4 and 5 are signed by PA Mrs. Wilson (presumably Defendant Alicia Wilson). <u>See</u> ECF Nos. 137-4, 137-5.

In <u>Miltier v. Beorn</u>, 896 F.2d 848, 854 (4th Cir. 1990), the Fourth Circuit recognized that supervisory defendants may be liable in a <u>Bivens</u> action if the plaintiff shows that: "(1) the supervisory defendants failed to provide an inmate with needed medical care; (2) that the supervisory defendants deliberately interfered with the prison doctors' performance; or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations." In so finding, the Court recognized that "[s]upervisory liability based upon constitutional violations inflicted by subordinates is based, not upon notions of *respondeat superior*, but upon a recognition that supervisory indifference or tacit authorization of subordinate misconduct may be a direct cause of constitutional injury." <u>Id.</u>  However, the plaintiff cannot establish supervisory liability merely by showing that a subordinate was

deliberately indifferent to his needs.  Id.  Rather, the plaintiff must show that  a  supervisor's corrective  inaction  amounts  to  deliberate  indifference  or  tacit authorization of the offensive practice. Id.

In this case, Plaintiff has not provided any evidence that these four Defendants tacitly authorized or were indifferent to an alleged violation of his constitutional rights. Instead, it appears  that  those  defendants  may  have  simply  failed  to  grant  Plaintiff relief during the administrative process. However, an administrator's participation in the administrative remedy process is not the type of personal involvement required to state a Bivens claim.   See  Paige  v. Kupec, 2003  WL  23274357  *1  (D. Md.  March 31, 2003).

Accordingly, Plaintiff cannot maintain a Bivens claim  against  Loretta Lynch, Charles E. Samuels; J.F. Caraway, or Mr. Weaver. Moreover, in reviewing claims of medical care, supervisors are entitled to rely on the judgment of the medical staff as to the course of treatment prescribed. Thus, even assuming these supervisory defendants had any notice of Plaintiff's administrative grievance regarding his medical needs, it does not rise to the level of personal involvement for liability in this suit.   See Shakka v. Smith, 71 F.3d 162, 167 (4th Cir. 1995); Dunn v. Stewart, 2012 WL 6963923, * 5 (N.D. W.Va. 2012); Sanders v.  O'Brien, 2011 WL 2972089, *10 (N.D. W.Va. 2011); DeBerry v. Gilmer,  2010  WL  3937956,  *6  (N.D. W.Va. 2010). Accordingly, these supervisory defendants should be dismissed.

### 3) Defendants Rebecca Grove and Joshua Hall, RN

In  asserting  his  Bivens  claims, Plaintiff alleges that  Joshua Hall, RN violated his constitutional rights when he was deliberately indifferent to his serious medical needs. ECF No. 17 at 21 - 22. Plaintiff's complaint also lists Rebecca Grove, Assistant Health Service Administrator as being deliberately indifferent to his serious medical needs [id. at 5], but his

complaint makes no specific allegation against her. In his response in opposition to the Federal Defendants' dispositive motion, Plaintiff contends that as Assistant Health Services Administrator, Grove was responsible for the day-to-day operation of FCI Gilmer Health Services, and that he communicated with her by electronic messaging several times about issues with his medical care but he was ignored and no action was taken.[60]   ECF No. 137 at 9. He further argues that she, along with the other defendants, was aware he was being treated for Crohn's and knew about his symptoms. Id. at 16.

Title 42 U.S.C. § 233(a) makes the FTCA the exclusive remedy for specified actions against members of the Public Health Service ("PHS"). In particular, it protects commissioned officers or employees of the PHS from liability for "personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions" by requiring that such lawsuits be brought against the United States instead. The United States thus, in effect, insures designated public health officials by standing in their place financially when they are sued for the performance of their medical duties. Cuoco v. Moritsugu, 222 F.3d 99, 109 (2nd Cir. 2000). See also, United States v. Smith, 499 U.S. 160, 170  n. 11 (1990) (42 U.S.C. § 233 is one of several statutes passed to provide absolute immunity from suit for Government medical personnel for alleged malpractice committed within the scope of employment); Carlson v. Green, 446 U.S. 14, 20 (1980) (Congress explicitly provides in 42 U.S.C.§ 223(a) that the FTCA is a plaintiff's sole remedy against PHS employees); Apple v. Jewish Hospital and Medical Center, 570 F. Supp. 1320 (E.D.N.Y. 1983) (Motion for dismissal of the action against the defendant doctor, a member of the National Health Corps. granted and the United States substituted as defendant, and case deemed a tort action). Therefore, pursuant to 42 U.S.C. § 233(a), Congress made proceedings under the FTCA the sole avenue to seek relief against any PHS employee for

---

[60] As noted supra, none of these email responses were signed by Grove.  See ECF No. 137-3, 137-4, 137-5.

injuries resulting from the employee's performance of medical functions within the scope of his or her employment.  The Supreme Court confirmed this rule in <u>Hui v. Castaneda</u>, by specifically holding that the immunity provided by §233(a) precludes a <u>Bivens</u> action against individual PHS officers or employees for harms  arising  out  of  constitutional violations committed while acting within the scope of their  office or employment.  <u>Hui</u>, 559 U.S. 799, 802 (2010).

During  the  time  period  relevant  to  Plaintiff's  Complaint,  Defendant  Rebecca  Grove was the Assistant Health Service Administrator at FCI Gilmer and a PHS employee. ECF No. 104 at 22 - 25.  Thus, pursuant to 42 U.S.C. § 233(a), Defendant Grove is entitled to absolute immunity  from  <u>Bivens</u>  liability  for  all  claims  arising  from  the  medical  care  she  provided  to Plaintiff, and should be dismissed from the <u>Bivens</u> portion of Plaintiff's lawsuit.

Defendant Joshua Hall was a Registered Nurse at FCI Gilmer; as of June 4, 2015, he was commissioned as a Public Health Service officer as well. <u>Id.</u> at 22; <u>see also</u> Anderson Decl., ECF No. 104-1, ¶ 96 at 13. However,  a  careful  review  of  the  entire  medical  record  reveals  that Defendant Joshua Hall actually provided no medical care to Plaintiff prior to August 21, 2015,[61] when Hall was already a Public Health Officer. Thus, pursuant to 42 U.S.C. § 233(a), Defendant Joshua Hall is entitled to absolute immunity from <u>Bivens</u> liability for all claims arising from the medical  care  he  provided  to  Plaintiff,  and  should  be  dismissed  from  the  <u>Bivens</u>  portion  of Plaintiff's lawsuit.

### 4) <u>Alicia Wilson, PA; E. Anderson, D.O.; Andrea Hall, RN</u>

---

[61] The only notations in the Plaintiff's medical records prior to that date by Joshua Hall are an April 10, 2014 administrative note regarding Pledger's PPD skin test [ECF No. 104-2 at 79] and on October 28, 2014, Hall co-signed as a witness on Pledger's Influenza Vaccine Consent form when Pledger declined a flu vaccine.  <u>See</u> ECF No. 104-2 at 148; <u>see also</u> ECF No. 104-2 at 137.

Plaintiff alleges that Alicia Wilson, PA; Dr. Anderson; and Andrea Hall, RN violated his constitutional rights when they were deliberately indifferent to his serious medical needs. ECF No. 17 at 20 - 22. Plaintiff alleges that for at least the six-month period between March 9, 2015 until September 8, 2015, FCI Gilmer Health Services staff deliberately failed to provide timely and correct diagnosis, testing, and treatment for his Crohn's disease. As a result, he suffered terrible pain, emotional distress, and lost a portion of his colon.[62]

To understand Crohn's Disease, a basic understanding of the anatomy of the lower GI tract is necessary. The GI tract includes the mouth, esophagus, stomach and bowel. The bowel extends from the stomach to the anus; the first part, the small intestine, is roughly 3 – 5 meters (20 – 23 feet) long and has three sections: the duodenum, jejunum, and the ileum. The duodenum connects directly to the stomach; then to the jejunum, which ends in the ileum, which feeds into the large bowel, or colon, at the ileocecal valve, then into the ascending, transverse, and descending sections of the colon, then the sigmoid colon, and finally, the anus. This anatomy is illustrated by the diagram below.[63]

---

[62] While Pledger's complaint says he lost a portion of his colon, it is clear from the record that he lost a portion of both his ileum and colon.

[63] See Lower Gastrointestinal Tract, *available at*: < https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0022856/ > and Know Your Body – Cecum, *available at*: http://www.knowyourbody.net/wp-content/uploads/2017/09/Cecum-Location.jpg



It is undisputed that Plaintiff's chronic medical condition of Crohn's disease is a sufficiently serious condition, given that untreated or improperly treated, it can result in death. It is clear from the record that Pledger has properly alleged the same.

The objective element of stating a deliberate indifference claim also requires Pledger to prove that his serious medical need was not timely or properly treated. Pledger contends that the delay in treatment exacerbated his condition, caused him excruciating pain, and resulted in a loss of part of his bowel. His medical records show that he presented at Health Services 36 times between June 18, 2014 and September 8, 2015 for Crohn's symptoms, often reporting severe stabbing pain at a magnitude of 8 or 10 on a scale of 1 – 10, seeking the promised diagnostic testing and begging for help. While it is undisputed that *some* treatment was provided, i.e., medications and labs were ordered; abdominal x-rays were done on March 24, 2015 and May 28, 2015; on June 19, 2014, an order for a general surgery consult for an EGD and colonoscopy was made and the tests were performed on May 19, 2015; on June 5, 2015, an abdominal ultrasound was ordered and a CT scan was "considered," and on July 20, 2015, a gastroenterology consult

was requested, FCI Gilmer Health Services staff repeatedly dismissed Plaintiff's complaints of severe pain and symptoms of progressively-worsening Crohn's, and put him off with promises of outside providers and diagnostic testing. Despite the prolonged severity of Plaintiff's GI symptoms, he was never seen by the gastroenterologist, the CT scan was never done until after he finally collapsed in agony on September 9, 2015 and was taken to the hospital, and the abdominal ultrasound was never done.

The subjective element requires a showing that the defendants' actions were wanton. The standard for wantonness depends upon the circumstance of the case. Wilson, 501 U.S. at 302-03. Deliberate indifference requires, at a minimum, that the defendant thought about the matter and chose to ignore it. It may appear when prison officials deny, delay, or intentionally interfere with medical treatment. McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds*, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997).   Or, as here, it may appear when prison officials provide some treatment but ignore the indications that a far more serious problem is occurring, and fail to take steps to address a life-threatening problem. The fact that Plaintiff received "some treatment is consistent with the allegation that his doctors ignored and failed to treat many of his symptoms. See Jehovah v. Clarke, 792 F.3d 457, 469 2015 U.S. App. LEXIS 11818, (4th Cir. 2015) (emphasis in original) (*citing* De'Lonta v. Johnson, 708 F.3d 520, 526 (4th Cir. 2013)(finding that the fact that the plaintiff received some treatment did not mean she received treatment for a particular ailment or that the treatment was reasonable); see also Greeno v. Daley, 414 F.3d 645, 655 (7th Cir. 2005) (noting that continued treatment that is known to be ineffective can constitute an Eighth Amendment violation).

Pledger avers that he requested referrals to outside providers to obtain a diagnosis; he also avers that he repeatedly reported severe pain.  The record fully supports his claims, and

reflects that in the entire time at FCI Gilmer prior to his September 8, 2015 collapse, the only time he was ever given anything specifically for pain relief was on June 19, 2014 when he received the one-time injection of the NSAID Toradol. The Federal Defendants do not specifically deny Plaintiff's assertions; instead, they attach the sworn declaration of Dr. Anderson, who, notably, fails to mention the fact that Plaintiff's Mesalamine was not restarted in four weeks, as the surgeon Lanasa directed, and likewise omits mention that Health Services staff failed to check back with Lanasa in 4 weeks as Lanasa also directed. FCI Gilmer Health Services' staff's continued failure to recognize Plaintiff's obvious Crohn's disease symptoms, and its dismissiveness of those ever-worsening symptoms, reveals a   callous, deliberate indifference to the level of Pledger's suffering.  The obvious progression of Pledger's Crohn's disease went on for months while FCI Gilmer Health Services staff repeatedly ignored the indications that a far more serious problem was occurring, and failed to take steps to address a life-threatening problem.

Defendant Dr. Anderson produced a sworn declaration in support of the Federal Defendants' arguments. While Pledger did not provide a sworn affidavit, his Bivens complaint was signed under a declaration under penalty of perjury and attests that the information contained in his complaint was true and accurate, thus making its allegations "the equivalent of an opposing affidavit for summary judgment purposes." World Fuel Servs. Trading, DMCC v. Heibei Prince Shipping Co., 783 F.3d 506, 516 (4th Cir. 2015)(internal quotation marks omitted)."

The Federal Defendants do not appear to dispute that Pledger's Crohn's disease symptoms constitute serious health issues. Instead, they focus on the subjective component of Pledger's claim, arguing that he cannot meet the subjective bar of a deliberate indifference claim

because he received extensive treatment for his Crohn's from FCI Gilmer's Health Services staff. The undersigned is not persuaded.

First, Anderson's sworn declaration omits crucial information. Most significant that Anderson fails to mention that FCI Gilmer Health Services staff failed to re-start Pledger's Mesalamine after four weeks, as directed by the surgeon Lanasa after the May 19, 2015 EGD/colonoscopy.[64] Anderson also conspicuously fails to mention that FCI Gilmer Health Services' staff's never followed up or consulted with Lanasa in four weeks to report Plaintiff's progress or lack thereof, off the Mesalamine, as instructed, despite his obvious and worsening Crohn's symptoms.[65] Obviously, as a federal prisoner, Pledger was completely dependent upon the Health Services staff to arrange for his follow up care; if they chose not to, he could not arrange for it himself.

Anderson himself saw Pledger on March 10, 2015, after Pledger had already been on Mesalamine for nearly nine months; even while on medication to control his Crohn's symptoms, Anderson noted that Pledger's rate of Crohn's flare up recurrence was about every two months. ECF No. 104-3 at 97. Nonetheless, despite their awareness of Pledger's medical history, nothing

---

[64] Lanasa's operative report stated "[t]The plan will be to stop the mesalamine for four weeks.  The patient is already taking omeprazole 20 milligrams daily. We are going to increase that to 40 milligrams daily and recheck the patient as needed.  Await also the results of the biopsy."  ECF No. 104-3 at 219.

[65] Despite the apparent confusion regarding the alleged finding of "no Crohn's" *in the colon*, the FCI Gilmer Health Services staff, as health professionals, should know, at the very least, that Crohn's disease, while it has exacerbations and remissions, never goes away permanently; it is a chronic, lifelong disease. Notwithstanding the implications otherwise in the record, none of which appear to be direct quotes from Lanasa, it is unlikely that Dr. Lanasa, an experienced surgeon, would conclude that Pledger did not have Crohn's on the basis of a single nearly-negative colonoscopy. A finding of no ulceration in the colon is not surprising in a Crohn's patient, given that, as noted *supra*, as much as 80% of Crohn's disease is found in the small bowel, which is not examined in a colonoscopy. It seems likely, given that Lanasa's plan was for Pledger to only have a four-week trial without Mesalamine to let his gastritis and gastric and duodenal ulcers heal, before reevaluating his situation "as needed," [ECF No. 104-3 at 219] that Lanasa recognized the necessity to reevaluate Pledger, to verify whether his Crohn's symptoms had abated or exacerbated without Mesalamine. Moreover, given the several notations in the BOP medical records as to Plaintiff's previous and apparently only colonoscopy having been in 2004 or 2005, it is apparent that the BOP had access to at least *some of* Plaintiff's prior 2004 or 2005 records, saying he did have Crohn's, a chronic disease for which there is no cure.

in the record indicates that FCI Gilmer Health Services ever bothered to contact Lanasa to update him on Pledger's status, or ever permitted Plaintiff to be re-evaluated by Lanasa, despite Pledger's obviously-worsening condition. It is obvious that the Crohn's rapidly exacerbated after the Mesalamine was discontinued after the May 2015 EGD and colonoscopy. Given the intensity and unrelenting progressiveness of Pledger's symptoms, FCI Gilmer Health Services staff should have prioritized the gastroenterology consult and CT scan, and done more than offer water, rest, and "consider" the abdominal ultrasound.

Likewise, Anderson omits mention of the *months* that Pledger begged for the promised outside testing and was simply put off. Instead, Anderson attempts to minimize Plaintiff's symptoms, omits mention of the severity of his prolonged pain and suffering, and draws attention to instances of Plaintiff's alleged non-compliance: a May 21, 2018 refusal of a low fiber diet, for which no reason was given; however, the refusal form alludes to a warning that  Pledger's Crohn's might get worse. The undersigned finds this unpersuasive; at this point, Pledger had just been told (or thought he had been told) two days earlier that he did not *have* Crohn's. The record is silent as to why Pledger declined the diet.

Anderson also stresses Plaintiff's June 16, 2015 inappropriate non-low fiber commissary purchases; Plaintiff's response in opposition to the Federal Defendants' dispositive motion attempts to refute this; he reports that he explained to Anderson that he did not eat the items purchased "but instead used them to purchase food items he could eat." ECF No. 137 at 4.  It is unclear what Pledger meant here, but it appears obvious from the record that by this time, Pledger was attempting to survive as best he could, given FCI Gilmer Health Services staff's apparent unwillingness to do anything to help.

Anderson also points to Pledger's failure to take a recommended dose of "Crohn's medication;" the medication referred to was *not* a "Crohn's medication," it was Bentyl (Dicyclomine), an antispasmodic used to treat irritable bowel syndrome; it would have been useless to treat Crohn's disease.  Nonetheless, on June 16, 2015, and again on June 17, 2015, Pledger did admit he had not yet started taking the Bentyl that had been ordered on June 5, 2015. There is no explanation documented in the record as to why.  However, at least by July 8, 2015, Pledger reported that he was taking it, and not surprisingly, that it "did not help."

Anderson also points to a July 27, 2015 failure on Pledger's part to take prescribed iron; the record reveals that Pledger admitted not taking the taking iron supplement because it constipated him so much; as it was, he was already only able to defecate once every 3 – 4 days. Pledger's recommended low-fiber diet may have also been contributing to his constipation. The undersigned finds that with the progressive swelling from months of untreated Crohn's gradually closing off Pledger's colon, at that point, doing anything that would increase his constipation would have been unbearable.

Anderson touts the many medications prescribed to Pledger, noting that Pledger received Prednisone and "Methylprednisolone and Ketorolac injections when necessary[.]" ECF No. 104-1 at 12.  Pledger was given Methylprednisolone (to suppress Crohn's symptoms) and a Ketorolac (Toradol) injection (for pain) exactly one time each, on June 19, 2014, when he first presented with Crohn's symptoms; other than that one injection of Ketorolac (Toradol), he never received anything else for Crohn's pain again, until after his September 2015 surgery.

Anderson also notes that Plaintiff was given Sucralfate, "Dicyclomine and Bentyl for his abdominal pain." Sucralfate's purpose was to coat the gastric lining to help heal the gastritis and ulcers, not to treat abdominal pain or Crohn's, and Dicyclomine and Bentyl are merely the

generic and brand names for the same drug, an antispasmodic that did nothing to help Plaintiff's pain. See ECF No. 104-3 at 65.

Regarding the "big ball" Pledger reported on the right side of his abdomen on August 14, 2015, Anderson's sworn declaration claims that "[s]ubsequent examinations did not reveal the existence of any mass. The normal colonoscopy and subsequent examinations which found no mass are evidence that the mass felt on this day was simply stool in the colon." Anderson Decl., ECF No. 104-1, ¶ 55 at 8. This claim is disingenuous and a gross misrepresentation that is unsupported by the record. Pledger first reported this painful mass in his RLQ on July 27, 2015 [ECF No. 104-3 at 57 – 60], but PA Lehmann was not able to palpate it; however, by August 14, 2015, PA Lehmann did note finding a firm, tender, 6 cm x 3 cm mass in Pledger's RLQ [ECF No. 104-3 at 199]; and  on August 17, 2015, S. Hudnall RN also noted that Pledger had a painful "knot" on the right side of his stomach, but there is nothing in the record to indicate that Hudnall even attempted to examine Pledger's abdomen that day.  ECF No. 104-3 at 52 – 55. Although no further Health Services staff ever documented a mass in that area, Pledger continued to report pain there. When he finally collapsed on September 8, 2015, it was with RLQ pain [ECF No. 104-3 at 36] and the CT scan at SJMH later that day showed inflammatory changes in the same area. The September 11, 2015 pathology report indicates that a 19-cm section of his right colon was acutely ulcerated, with stricture,[66] abscess, and acute serositis;[67] the pathologist noted that "6

---

[66] Stricture is an abnormal narrowing of a bodily passage.

[67] The organs of the chest and abdomen are lined with thin layers of tissue called serous membranes. Serous membranes have two layers: one connected to the organ and the other connected to the inside of the body cavity. Between the two layers, a thin film of serous fluid permits the organs to move smoothly within the body without friction, such as when a deep breath is taken, the lungs can expand. Serositis occurs when the serous membranes are inflamed; it makes it hard for the organs to smoothly slide around in the body, causing pain and other symptoms. There are three types of serositis, depending on which membrane is involved: pericarditis, pleuritis, and peritonitis. The main symptom of peritonitis is severe abdominal pain. Other potential symptoms include: abdominal bloating, fever, nausea and vomiting, low appetite, diarrhea or constipation, limited urine output, and/or extreme thirst.  See What is Serositis? available at: < https://www.healthline.com/health/serositis >

cm from the distal margin is a 4 cm area of obstructed colon with *obliteration of lumen*[.]" ECF No. 104-3 at 190 – 91 (emphasis added).  Further, a 13 cm section of Pledger's terminal ileum was removed; it, too, showed focal acute ulceration and epithelial erosion with serosal and other pathological changes. Id. These findings demonstrate that Pledger's colon was so swollen inside from untreated Crohn's, that its lumen (the interior open channel where stool should have been able to pass through) was completely blocked. Even without the pain from the ulceration, stricture, abscess, and infection, this complete obstruction alone would have caused Pledger to have endured unimaginable suffering.  Clearly, there was more than "simply stool in the colon." Moreover, claiming that no mass was found in Pledger's abdomen is meaningless if the abdomen is not examined.

Finally, as noted *supra*, the record is replete with instances of FCI Gilmer Health staff's apparent indifference to Pledger's suffering and their attempts to minimize Plaintiff's symptoms when documenting them. Plaintiff presented repeatedly reporting severe stabbing pain, at a level of 8 – 10 on a scale of 1 – 10; Health Services staff would document it, but then inexplicably noted that he was in "no acute distress."   See ECF Nos. 104-3 at 38, 41, 47, 49, 53, 221. Likewise, when Plaintiff presented with acute abdominal pain, at times, FCI Gilmer Health Services staff would document that he had a normal abdomen with "no peritoneal signs," while simultaneously documenting that he had guarding when his abdomen was palpated, an obvious peritoneal sign of an acute abdomen.

Anderson personally reviewed a June 25, 2015 note by Dr. Savidge[68] regarding Pledger's obvious Crohn's symptoms of 20# weight loss in the past year; his recent labs showing

---

[68] Per Dr. Savidge's request, this note reviewed was by Dr. Anderson the next day. ECF No. 104-3 at 70 - 71.

progressively worsening blood loss anemia; and recent EGD/colonoscopy findings; in that note, Savidge specifically documented that Pledger's Mesalamine had been "temporarily discontinued [ECF No. 104-3 at 70];" at that point, per Lanasa's order, the Mesalamine should already have been re-started 5 days earlier, on June 20, 2015.

On August 17, 2015, Pledger was seen by S. Hudnall RN for abdominal pain and a painful "knot" on the right side of his stomach.  ECF No. 104-3 at 52 – 55.  Although his pulse and temperature were both obviously elevated, Hudnall documented that his vital signs were "stable." Id. at 53.  Despite the fact that he reported that he had had the pain for months; that it had gotten worse in the past 3 – 4 months; that he could not eat because it hurt so much; and that he had lost 45 pounds, she noted that he was in "no acute distress." Id. She does not appear to have examined his abdomen. She also noted that Plaintiff reported having been on Omeprazole, which had helped, but that the prescription expired and was not renewed. Id. She did not renew this medication; instead, she gave him nothing more than the usual advice about following up at sick call as needed and returning immediately if his condition worsened. This note was co-signed by both PA Wilson and Dr. Anderson on August 18, 2018. See ECF No. 104-3 at 54 – 55.

On August 21, 2015, at 6:30 am, when Plaintiff was seen by Joshua Hall RN in Health Services for nagging RLQ abdominal pain, described as a "10" on a scale of 1 – 10, Joshua Hall noted his finding of Plaintiff's abdomen being soft, but with some guarding and tenderness in the RLQ. Guarding is a peritoneal sign of an acute abdomen. Nonetheless, Hall documented that there were "no significant findings" on exam, and that Plaintiff was in no apparent distress. ECF No. 104-3 at 46 – 48. This note was reviewed and co-signed by Dr. Anderson later that morning. ECF No. 104-3 at 48.

Anderson himself saw Pledger later on August 21, 2015; Pledger was so uncomfortable he reported feeling like something in his abdomen was going to "bust open." ECF No. 104-3 at 49. Anderson's note denied that Plaintiff had guarding on palpation of the abdomen.  Further, while Anderson documented that Pledger was "irritable and agitated," in complete contradiction, he also documented that Pledger appeared "well" and was not distressed or in pain.  Id. Anderson noted that Pledger still had a pending gastroenterology consult and "had seen general surgery already" but did not acknowledge that Health Services staff had *completely failed to follow the post-EGD/colonoscopy treatment recommendations* of the general surgeon. Id. at 50. He also noted that he would inquire about the priority for the abdominal ultrasound [id.]; there is no indication in the record that he did so.

An August 22, 2015 note by Andrea Hall RN impliedly suggests Pledger was exaggerating his pain, because an Operations Lieutenant reported Pledger's "after hours" complaint of abdominal pain the night before to the on-call medical provider; the Operations Lieutenant had apparently instructed Plaintiff to report to Health Services first thing in the morning, but because Plaintiff did not show up at Health Services until 11:30 am for medication pill line and made no mention of pain [ECF No. 104-3 at 44], the implication was that Pledger was malingering the night before. This ignores the obvious fact that Crohn's pain is *episodic;*[69] Pledger could very well have been in severe pain the night before, but not the following morning, because Crohn's pain comes and goes.

Anderson's own documentation in the record was also contradictory at other times. Specifically, on September 8, 2015, when Anderson documented having been called to examine

---

[69] Crohn's disease is a chronic inflammatory illness characterized by episodic abdominal pain, diarrhea, fever, bleeding and obstruction.  See Evaluation of the Meaningfulness of Health-Related Quality of Life Improvements as Assessed by the SF-36 and the EQ-5D VAS in Patients with Active Crohn's Disease, *available at*: < https://www.ncbi.nlm.nih.gov/pubmed/19222413 >

Pledger after he finally collapsed, he noted that Pledger's abdomen was "within normal limits," while simultaneously documenting that Pledger's abdomen was soft "with some guarding and RLQ tenderness."  ECF No. 104-3 at 36. An abdomen can hardly be considered to be "within normal limits" if there is excruciating pain and guarding; guarding is a peritoneal sign of an acute abdomen, an ominous sign of impending peritonitis.

The Individual Federal Defendants admit to some delay in providing Pledger with diagnostic testing. Nonetheless, even focusing only on the evidence in the record of Plaintiff's bloody stools, months of continued pain, the "knot" that in his abdomen, his increasing weight loss, signs of progressive blood loss anemia,[70] and the development of peritoneal signs, all obvious signs of Crohn's and the beginning of an acute abdomen, Pledger's sworn assertions that FCI Gilmer Health Services staff ignored and dismissed his serious symptoms for months, satisfies his burden as to the objective component of a deliberate indifference suit.

Here, while arguably, the failure to restart the Mesalamine within four weeks as directed by the surgeon Lanasa was medical negligence on FCI Gilmer Health Services staff's part, afterwards, the months in which Health Services staff ignored Pledger's worsening signs of severe and obvious Crohn's disease, offering useless suggestions to "drink more water," "rest," "come back if you need to" and unfulfilled promises to expedite the outside diagnostic testing and referrals, exhibits deliberate indifference to a serious medical need.

Pledger has alleged that FCI Gilmer Health Services staff acknowledged some symptoms but repeatedly ignored many ominous indicators of a life-threatening condition and failed to treat any of his symptoms effectively. In other words, Pledger has pled facts that, if true, would establish that Dr. Anderson, PA Alicia Wilson, and to a lesser degree, Andrea Hall RN, "actually

---

[70] Plaintiff's recorded H&Hs show a steady decline from a March 24, 2014 H&H of 13.4.40.3, to 9.1/29.0 on September 8, 2015, the day he collapsed and was finally taken to SJMH.

kn[e]w of and disregard[ed] an objectively serious condition, medical need, or risk of harm."
Jehovah, 792 F.3d at 469.   The record indicates that each of these three defendants either personally and repeatedly denied care and dismissed Plaintiff's symptoms, and/or that they reviewed and/or signed off on notes by other Health Services staff who did so.

Viewing the evidence in the light most favorable to Pledger, the undersigned finds that the record fairly supports a claim that FCI Gilmer Health Services staff, specifically, Dr. Anderson, PA Alicia Wilson, and to a lesser degree, Andrea Hall RN, were aware of Pledger's pain and symptoms of Crohn's but unreasonably delayed or withheld treatment anyway.

Accordingly, the undersigned finds that the Individual Federal Defendants' dispositive motion should be denied as to Anderson, Wilson, and Hall. The Bivens complaint, viewed in the light most favorable to the Plaintiff, is sufficient to survive these remaining Individual Federal Defendants' dispositive motion. It gives the defendants fair notice of Plaintiff's claims and the grounds upon which they rest.   The undersigned cannot make a determination on the present record as to whether Dr. Lanasa ever actually advised that Plaintiff did not have Crohn's or whether that was merely a misunderstanding on Plaintiff's part, repeated to FCI Gilmer Health Services staff and then repeated back to Plaintiff; and/or whether Plaintiff's bowel actually perforated as a result of the delay in treatment. The full record is not before the Court.  Notably, at a minimum, missing are copies the September 2015 SJMH record: the complete emergency room records; the admission history and physical; any consultation reports; the September 11, 2015 operative report; the microscopic report on the 15 blocks of tissue submitted to the pathologist for examination; and the physician's discharge summary. Further, copies of any of Plaintiff's prior medical records within the BOP's possession, regarding his 2004 or 2005 diagnosis of Crohn's disease, and the complete records of Dr. Lanasa, including any

communications with FCI Gilmer Health Services before and after the May 19, 2015 EGD/colonoscopy are necessary to clarify how much the Federal Defendants actually knew about Plaintiff's Crohn's history at the time Plaintiff was under their treatment.

## V. <u>Recommendation</u>

Accordingly, for the foregoing reasons, the undersigned recommends that the United States' Motion to Dismiss [ECF No. 36] be **GRANTED in part** as to Plaintiff's medical negligence claim and **DENIED in part** as to the IIED claim in Plaintiff's FTCA complaint [ECF No. 9] and that Plaintiff's FTCA medical negligence claim be **DISMISSED with prejudice** for failure to comply with the MPLA.

Regarding Plaintiff's <u>Bivens</u> claims, the undersigned further recommends that Defendant St. Joseph Hospital's first Motion to Dismiss [ECF No. 53] be **DENIED as moot**; that Defendant SJH's second Motion to Dismiss [ECF No. 141] be **GRANTED**; the Federal Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment [ECF No. 103] be **GRANTED in part** as to Defendants Lynch, Samuels, Caraway, Weaver, Grove, and Joshua Hall and **DENIED in part** as to  Defendants Anderson, Wilson, and Andrea Hall, and that Plaintiff's <u>Bivens</u> complaint [ECF No. 17] be **DISMISSED with prejudice** against Defendants Lynch, Samuels, Caraway, Weaver, Grove, and Joshua Hall for failure to state a claim upon which relief can be granted, and that a scheduling order be entered.

Further, the undersigned recommends that Plaintiff's pending Request for Judicial Notice [ECF No. 136] be **DENIED as moot.**

**Within fourteen (14) days** after being  served  with  a  copy  of  this  Report and Recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objections are made and the basis for such objections.

A copy of any objections should also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation**. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Report and Recommendation to the *pro se* Plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and to transmit a copy electronically to all counsel of record.

Upon entry of this Report and Recommendation, the clerk of court is **DIRECTED** to terminate the Magistrate Judge association with this case until further Order of the District Judge.

DATED: August 16, 2018

/s/ *Michael John Aloi*
MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE